### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| IN RE MATCH.COM CONSUMER LITIGATION | MASTER FILE: 3:10-cv-02651-L<br><br>(Consolidated with Civil Action Nos. 3:11-cv-01354-L, 3:11-cv-01913-L, 3:11-cv-02319-L, 3:11-cv-02322-L, 3:11-cv-02323-L)<br>**JURY TRIAL DEMAND** |

### CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Mary Anne Burgan, Mike Cipriani, Kristy Gamayo, Nancy Malsom, Claire Kilcoyne, Mark Harken, and Jesse Kaposi ("Plaintiffs"), by their undersigned attorneys, bring this consolidated amended class action complaint against Match.com, LLC ("Match" or the "Company").  Plaintiffs' allegations are based upon knowledge as to their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief is based upon, among other things, a comprehensive investigation undertaken by their attorneys, which included, without limitation: (a) interviews of witnesses, including former employees of Match and the Company's subcontractors; (b) review of Match's published materials and information available on the internet; (c) analysis of public records and documents, including the Company's filings with the Securities and Exchange Commission; and (d) an exhaustive analysis of thousands of inactive, fake, and fraudulent profiles posted on Match's website.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a class action against Match for violations of Section 17.50(a)(3) of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), breach of contract, and

breach of the implied covenant of good faith and fair dealing.  Plaintiffs and members of the

class (the "Class") are all current and/or former paying subscribers to Match's online dating

service.

2.      Match is an online dating service that represents itself as the preeminent service

for single adults to meet each other online.  As alleged herein, Match violated the DTPA and

breached its Terms of Use Agreement (the "Agreement")[1] by taking advantage of its unwitting

consumers (including Plaintiffs and Class members) to a grossly unfair degree by advertising

itself as a legitimate service for single adults when, in fact, Match's service is little more than a

scheme to amass subscribers based on false and deceptive marketing and through systemic and

pervasive unconscionable practices.

3.      While Match purports to have "millions" of active subscribers, *well over half* of

the profiles on its site belong to inactive subscribers who have cancelled their subscription or

allowed their subscriptions to lapse and/or are fake and fraudulent profiles posted by scammers

and others.  To the extent these types of profiles do not belong to the scammers that proliferate

the site (virtually unimpeded by Match), the rest are unreachable by legitimate users attempting

to avail themselves of the services offered by Match and paid for via subscription fees.

4.      With regard to inactive subscribers (*i.e.*, those who have cancelled their

subscriptions and/or allowed their subscriptions to lapse), Match takes virtually no action to

remove these profiles (that remain on the system, are searchable by subscribers, appear as and

are, in fact, counted among Match's "active" subscribers), for months and sometimes years after

the individuals have become inactive.  And, Match will only remove profiles after a former

subscriber calls to complain and specifically requests its removal.

---

[1]      A copy of the Agreement is attached as Exhibit A.

5.     With regard to the thousands of fake and fraudulent profiles (*i.e.*, profiles likely placed by third-parties for illegitimate and unlawful purposes), Match likewise makes little to no effort to vet, police, or remove these profiles and thereby permits, condones, and acquiesces in their posting.  Match engaged (and continues to engage) in these illegal practices for the purpose of misleading Plaintiffs and other Class members into believing that millions of individuals were active subscribers.  These practices further exposed Plaintiffs and Class members to frauds and other schemes.

6.     Plaintiffs, on their own behalves and as representatives of the Class, seek to recover compensatory damages in the amount of fees paid for subscriptions to the Match site.

7.     Plaintiffs also seek injunctive relief ordering cessation of the wrongful and deceptive practices, implementation of administrative changes designed to remedy current and future problems, improved disclosure to Match subscribers and prospective subscribers regarding the number of active subscribers, cessation of Match's actual wrongful practices complained of herein, and revision of the language of the Agreement so as to make its terms clear to Class members.

## JURISDICTION AND VENUE

8.     This Court has diversity subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 ("CAFA"), which, *inter alia*, amends 28 U.S.C. §1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed Class; (b) at least some members of the proposed Class have a different citizenship from Match; and (c) the claims of the proposed Class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate.  *See* 28 U.S.C. §1332(d)(2) and (6).

9.      This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of the Court, Match is headquartered in the State of Texas, Match transacts business within the State of Texas, and by virtue of the fact that Match's executive offices are located in the State, Match systematically and continually conducts business throughout the State of Texas, including the Northern District of Texas.

10.     Venue is proper in the Northern District of Texas because Match is headquartered in this District, conducts substantial business in this District, maintains offices in this District, and because certain of the acts or omissions affecting Class members occurred in this District.

11.     Further, venue is proper in this jurisdiction because the Agreement[2] provides that disputes regarding Match's service shall be governed by the laws of the State of Texas and filed in state or federal court in Dallas County, Texas.

## PARTIES

12.     Plaintiff Mary Anne Burgan is a resident of Texas and, at all relevant times, was a paid subscriber and/or former paid subscriber to Match's online dating service.

13.     Plaintiff Mike Cipriani is a resident of Texas and, at all relevant times, was a paid subscriber and/or former paid subscriber to Match's online dating service.

14.     Plaintiff Kristy Gamayo is a resident of California and, at all relevant times, was a paid subscriber and/or former paid subscriber to Match's online dating service.

15.     Plaintiff Nancy Malsom is a resident of Iowa and, at all relevant times, was a paid subscriber and/or former paid subscriber to Match's online dating service.

16.     Plaintiff Claire Kilcoyne is a resident of Washington and, at all relevant times, was a paid subscriber and/or former paid subscriber to Match's online dating service.

---

[2]      Further references to specific provisions of the Agreement will be cited as "Agreement ¶___."

17.     Plaintiff Mark Harken is a resident of Texas and, at all relevant times, was a paid subscriber and/or former paid subscriber to Match's online dating service.

18.     Plaintiff Jesse Kaposi is a resident of California and, at all relevant times, was a paid subscriber and/or former paid subscriber to Match's online dating service.

19.     Defendant Match is a Delaware limited liability corporation that maintains its headquarters and principal place of business in Dallas, Texas.   Match is a wholly owned subsidiary of IAC/Interactive Corp. and operates an interactive website for single adults to meet each other online.   Subscribers pay a monthly fee to access all features of the website.

## CLASS ACTION ALLEGATIONS

20.     Plaintiffs bring this class action, on their own behalves and on behalf of all similarly situated individuals who, at any time between December 30, 2006 and June 29, 2011 (the "Class Period"), purchased subscriptions or renewals of subscriptions for the Match service.

21.     This action is properly maintainable as a class action.

22.     The Class is so numerous that joinder of all members is impracticable.

23.     The number and identities of Class members can easily be determined from the records maintained by Match and/or its agents.   The disposition of their claims in a class action will be of benefit to the parties and to the Court.

24.     A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted, and no unusual difficulties are likely to be encountered in the management of this action as a class action.   The likelihood of individual Class members prosecuting separate claims is remote.

25.     There is a well-defined community of interest in the questions of law and fact affecting members of the Class.  Among the questions of law and fact common to the Class, and which predominate over questions affecting any individual Class member are, *inter alia*:

(a)     Whether Match violated § 17.50(a)(3) of the DTPA by taking advantage of unwitting consumers' lack of knowledge, ability, experience, and/or capacity to a grossly unfair degree;

(b)     Whether Match breached its contract and common law covenants with Plaintiffs and others similarly situated by: (i) failing to provide the service represented by Match and understood by Plaintiffs and Class members to be a legitimate service for single adults; (ii) acting in contravention of the provisions of the Agreement;  and (iii) by otherwise acting in bad faith in carrying out the terms of the Agreement; and

(c)     Whether Match breached its contract and common law covenants with Plaintiffs and others similarly situated by, *inter alia*: (i) permitting, condoning, acquiescing, and/or failing to take any remedial steps to curb the posting of fake or fraudulent profiles by international internet scammers or others; (ii) allowing tens of thousands of inactive profiles to appear active for the purpose of artificially inflating its customer base; (iii) sending deceptive emails to Plaintiffs and Class members that suggested falsely that active subscribers were seeking to contact them for the purpose of securing renewal subscriptions; and (iv) for otherwise engaging in deceptive marketing and business activity that harmed Plaintiffs and Class members.

26.     Plaintiffs are members of the Class and committed to prosecuting this action. Plaintiffs have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other Class members in that they seek compensatory

damages for Match's violations of the DTPA, breach of contract, and breach of implied common law covenants by Match's conduct as alleged herein, the same claims being asserted on behalf of each individual Class member.  Plaintiffs do not have interests antagonistic to or in conflict with those they seek to represent.  Plaintiffs, therefore, are adequate representatives of the Class.

27.     The likelihood of individual Class members prosecuting separate individual actions is remote due to the relatively small loss suffered by each Class member as compared to the burden and expense of prosecuting litigation of this nature and magnitude.  Absent a class action, Match is likely to avoid liability for its wrongdoing, and the Class members are unlikely to obtain redress for the wrongs alleged herein.

28.     Adjudication of this case on a class-wide basis is manageable by this Court.  The Agreements entered into by Plaintiffs and each Class member throughout the United States and its possessions are the same or so similar as to be legally and factually indistinguishable in all material respects.  Under the terms of said Agreements, Texas law is to be applied to all disputes.  As a result, it will not be difficult for the Court or the jury to determine whether Match has breached its contracts with each of the Class members.  This Court is an appropriate forum for this dispute.

## **COMPLIANCE WITH THE DTPA**

29.     In accordance with § 17.505(a) of the DTPA, Plaintiffs Burgan, Cipriani, and Harken, provided written notices to Match about their DTPA claims (the "DTPA Notices").

30.     In addition, because the claims alleged herein are made on behalf of a proposed class, in accordance with § 17.501(a), Plaintiffs simultaneously mailed a copy of the DTPA Notice to the Office of the Attorney General, Consumer Protection Division, by certified mail return receipt requested, together with a copy of the initial complaint filed in this action.

31.     The January 25, 2011 DTPA Notice served by Plaintiffs Burgan and Cipriani on Match advised the Company in great detail of the claims arising under § 17.50(a)(3), including that Match was engaging in the following unconscionable conduct:

a.     Representing itself as a legitimate service for single adults to meet each other online and accepting subscriptions fees from subscribers and then failing to provide the service represented and offered;

b.     Negligently and/or fraudulently representing that it had millions of active subscribers when, in fact, well over half of the profiles of the purportedly active subscribers belong to inactive accounts (*i.e.*, accounts that have been canceled or expired) that cannot be contacted and/or are fake and fraudulent profiles posted by scammers and others;

c.     Permitting, condoning, or acquiescing in the posting of fake or fraudulent profiles by international internet scammers or others; thereby creating the false impression that millions of persons were active subscribers or worse, exposing Plaintiffs and other Class members to frauds and other schemes;

d.     Failing to accurately disclose its active and reachable subscriber base;

e.     Falsely labeling inactive profiles as "active;"

f.     Failing to police its site from the proliferation of false and fraudulent profiles;

g.     Failing to take reasonable steps to remove and block scammers, even after certain profiles have been reported;

h.     Failing to disclose to subscribers that Match's online dating service contains mainly inactive profiles and/or fake profiles from internet scammers;

i.     Failing to provide adequate information and tools on how to recognize and report scamming activity;

j.     Failing to monitor and block Internet Protocol ("IP") addresses from certain countries from where scamming activity flourishes (*i.e.*, Nigeria, Ghana, Russia, Eastern Europe, Malaysia, and other locations);

k.     Intentionally leaving profiles of inactive subscribers viewable and searchable on its websites far beyond their date of inactivity or cancellation;

l.     Taking virtually no steps to remove inactive users from view until a complaint is received by the former user of that account;

m.    Falsely labeling profiles as "active within [#] days" or "active within [#] hours" when the accounts belong to cancelled and/or inactive accounts that could not be contacted;

n.    Sending emails of suggested "matches" to its subscribers and inactive subscribers, even though these "matches" belong to inactive subscribers who cannot be contacted;

o.    Sending former and inactive subscribers "winks" falsely informing them that a potential match is trying to contact them in order to bait individuals to renew their subscriptions (only to find out after they do so that the supposed seeker does not exist or cannot be contacted);

p.    Failing to effectively vet new profiles to determine whether they are fake or fraudulent despite easily discernable "red flags" (including repeated use of imagery and language, and use of notorious IP address origins);

q.    Approving and posting different profiles with the same exact photographs and groups of photographs in different cities and towns throughout the United States;

r.    Approving and posting different profiles with the same exact text in different cities and towns throughout the United States;

s.    Approving and posting profiles with individuals under the age of 18 in violation of the Agreement;

t.    Approving and posting profiles that have email addresses and full names in violation of the Agreement;

u.    Approving and posting profiles with photographs that depict individuals of incorrect gender;

v.    Approving and posting fraudulent profiles with famous and notorious actors and models;

w.    Falsely representing that Match customer care approves each profile individually when, in fact, profiles are automatically approved;

x.    Falsely representing that there is gender parity on Match when, in fact, the majority of active and legitimate subscribers are male;

y.    Failing to report or investigate scammers that repeatedly post fraudulent profiles on Match;

z.    Misleading use of the notice to subscribers that, "We're sorry the profile you were looking for could not be found. Please try another profile," when such profiles have been removed for violating the Agreement;

aa.   Failing to effectively police its site to monitor and remove fake and fraudulent subscriber profiles that remain viewable by unwitting subscribers;

bb.   Engaging in fraudulent or misleading business practices for the purpose of inducing individuals to renew their subscriptions, *i.e.,* sending to paid subscribers whose subscription are about to expire an electronic communication, or "wink," that falsely advises the subscriber that persons who are active Match subscribers are trying to contact them;

cc.   Continuously sending email notifications to former subscribers falsely advising them of potential "matches," in some cases more than a year after the person has deactivated their account, that are, in fact, profiles of inactive or nonexistent subscribers whose profiles disappear once the individual reactivates their account;

dd.   Falsely representing on the Match website that 20,000 people join the online dating service on a daily basis, when Match knew or should have known that the such number is vastly inflated, that the vast majority of its subscribers are, in fact, fake profiles; and

ee.   Falsely representing on the Match website that 7 out of 10 of Match subscribers are looking for serious long-term relationships when Match knew or should have known that the vast majority of its subscribers are inactive, fake or fraudulent profiles.

32.   The DTPA Notice also included the amount of economic damages and the amount of expenses and attorneys' fees reasonably incurred in asserting the claims against Match.

33.   The 60-day period to respond to the DTPA Notice expired on March 28, 2011 without Match responding or requesting additional time to respond.  Accordingly, Plaintiffs have fulfilled their procedural requirements for filing their DTPA claims.

34.   A copy of the January 25, 2011, DTPA Notice served by Plaintiffs Burgan and Cipriani on Match is attached as Exhibit B.  A copy of the August 1, 2011, DTPA Notice served by Plaintiff Harken on Match is attached as Exhibit C.

## FACTUAL ALLEGATIONS

**The Terms of Use Agreement**

35.     Match is an online dating service that represents in its Agreement that it is "the service for single adults to meet each other online."  Agreement ¶ *Intro.*

36.     Plaintiffs and Class members entered into the Agreement by subscribing to Match's internet website where the Agreement was posted.

37.     By entering into the Agreement, Plaintiffs and Class members became active subscribers of Match's service and paid monthly subscription fees.

38.     The Agreement is a valid contract between Match, on the one hand, and Plaintiffs and Class members, on the other hand.

39.     By paying monthly subscription fees to Match under the Agreement, Plaintiffs and Class members performed or tendered performance.

40.     The Agreement is an adhesion contract between Plaintiffs, Class members and Match, a large international corporation, under which Match has exclusive control over the terms of the Agreement and the delivery of services to Plaintiffs and Class members.

41.      Under the terms of the Agreement, a person can join Match at no cost with access to limited services.  In order to access additional features and services including, but not limited to, the ability to communicate with other subscribers, an individual must become a paying subscriber to the Match service.  Agreement ¶3.

42.     Under the terms of the Agreement, Match subscribers agree not to post or transmit to other subscribers or to Match any inaccurate material, misleading, or false information. Agreement ¶9(a).  Match further represents in the Agreement that Match may review and delete

any content, photos or profiles that in the sole judgment of Match violate the provision of the Agreement.  Agreement ¶9(b).

43.     Under the terms of the Agreement, Match reserves the right to investigate and take appropriate legal action in its sole discretion against anyone who violates the provisions of the Agreement including, but not limited to, removing the offending communication from the service and terminating the subscriptions of violators who post or provide information that is false or misleading. Agreement ¶9(d).

44.     The Agreement also provides that information posted in the profiles of subscribers must be accurate, current and complete.  Agreement ¶9(h).

45.     The Agreement also provides that Match will not allow its subscribers to: (a) "impersonate any person or entity;" (b) "'stalk' or otherwise harass any person;" and (c) "forge headers or otherwise manipulate identifiers in order to disguise the origin of any information transmitted through the Service."  Agreement ¶10.

46.     Match also represents that in order to protect the integrity of its service, Match reserves the right at any time in its sole discretion to block subscribers from certain IP addresses from accessing the website.  Agreement ¶14.

47.     The foregoing provisions of the Agreement would lead a reasonable consumer to believe that the information posted on Match's website is accurate and legitimate, Match does not tolerate and would actively police and remove any false or misleading information, and violators of these policies would be removed by Match and their subscription rights terminated.

48.     Match breached (and continues to breach) the terms of the Agreement by, *inter alia*:

        a.     failing to vet new profiles;

b.      failing to remove inactive profiles;

c.      failing to accurately disclose its active and reachable subscriber base;

d.      falsely labeling inactive profiles as "active;"

e.      failing to police its site from the proliferation of false and fraudulent profiles;

f.      failing to take reasonable steps to remove and block scammers, even after certain profiles have been reported;

g.      failing to properly warn subscribers of the proliferation of scammers on the site and failing to provide information on how to recognize and report scamming activity;

h.      failing to monitor and block IP addresses from certain countries from where scamming activity flourishes (*i.e.*, Nigeria, Ghana, Russia, Eastern Europe, Malaysia, and other locations);

i.      falsely representing itself as a legitimate service for single adults and accepting subscription fees from subscribers and then failing to provide the services offered;

j.      failing to require additional forms of personal identity verification as is required by Match's Japanese affiliate;

k.      failing to review and/or audit a percentage of new profiles rather than automatically accepting them without further review; and

l.      failing to employ photo or text tracking technology to identify duplicate profiles.

**Breaches by Match**

49.     Plaintiffs' investigation revealed that Match not only fails to remove the profiles of cancelled subscribers and/or those whose paid subscriptions have expired but, in fact, intentionally avoids doing so unless and until such persons expressly request that their profiles be removed from the site.

50.     Match fails to remove the profiles of these inactive and former subscribers in order to advertise to the public that Match has "millions" of active subscribers.  By artificially inflating its active subscriber numbers, Match engaged in a deceptive practice designed to induce consumers to either become or remain paying subscribers.

51.     Match goes so far to suggest that "1 in 5 relationships start online" and that the majority of those "start at Match.com."  This text appears on Match's opening page when someone visits the website for the first time – an outlandish and unfounded claim that essentially tells consumers that Match is responsible for more than 10% of all relationships. *See* copy of intro page attached at Exhibit D.

52.     In the course of Plaintiffs' investigation, numerous former Match employees and/or its subcontractors revealed that as many as 60% (and by some accounts *more*) of the profiles on the website belong to inactive and/or fake/fraudulent users whose profiles could be viewed by paying subscribers, appear to be active, but who could not be contacted.

53.     Former employees revealed further that Match routinely and intentionally represents that there are significantly more active subscribers on the website than there actually are.

54.     Witnesses, including former Match employees, reported that some of the tactics Match uses to falsely represent its site include, *inter alia*:

a.      intentionally leaving profiles of inactive subscribers viewable and searchable on its websites far beyond their date of inactivity or cancellation;

b.      taking virtually no steps to remove inactive users from view until a complaint is received by the former user of that account;

c.      falsely labeling profiles as "active within [#] days" when the accounts belong to cancelled and/or inactive accounts that could not be contacted;

d.      improperly sending emails of suggested "matches" to its subscribers and inactive subscribers, even though these "matches" belong to inactive accounts who cannot be contacted;

e.      sending former and inactive subscribers "winks" informing them that a potential match is trying to contact them in order to get them to renew their subscriptions (only to find out after they do so that the supposed seeker does not exist);

f.      failing to effectively vet new profiles to determine whether they are fake or fraudulent despite easily discernable "red flags" (including repeated use of imagery and language, use of notorious IP address origins, billing addresses that do not match profile locations, and a single payment source being used to create numerous profile accounts);

g.      failing to effectively police its site to monitor and remove fake and fraudulent subscriber profiles that remain viewable by unwitting subscribers; and

h.      failing to warn and protect its subscribers from the pervasive scammers that populate its site.

55.     In 2006-07, subscribers previously were able to hide their profiles by setting their accounts manually to "inactive" or "hidden."  However, in 2008, that policy was changed so that only Match corporate employees could block a subscriber's profile from view.

56.     The Match database was (and continues to be) littered with names and faces of numerous individuals whose profiles are "unavailable" and who cannot be reached by subscribers.  A substantial percentage of profiles cannot receive emails, a fact which Match, despite having the ability to do so, does not reveal to the subscribers who've paid for the ability to send emails.  A substantial percentage of the profiles are no longer paying subscribers or never were, but instead, are "filler profiles."

57.     Match does not have adequate safeguards to protect its subscribers from scammers who regularly access the site and post false profiles in order to mislead and commit frauds and other crimes against subscribers.  Further, Match does not adequately police its website to ensure that subscribers are, in fact, legitimate subscribers who are "interested in meeting each other" as the Agreement provides.

58.     When new subscribers submit a profile, they are told, "We have your profile and it's now being read, like all submissions, by our Customer Care team.  Once it's approved – usually within 24 hours – we'll send you an email to let you know it's live on the site."

59.     Match's representation (*i.e.*, that Match is engaging in an eyes-on approval process), is, in fact, false.   Indeed, new profiles are "approved" and posted almost instantaneously, illustrating that the approval process is mere window dressing to further deceive users into a sense of security.

60.     In the course of Plaintiffs' investigation, former Match employees or subcontractors, as well as other witnesses with knowledge, revealed that upwards of 60% of the

profiles (and by some reports more) were and are either inactive former users or fake or fraudulently posted by international internet scammers seeking to engage in identity theft or lure subscribers in fraudulent schemes.

61.     Witnesses also advised that little, if any, proactive steps were or are taken by Match to ensure that profiles posted by scammers were policed and removed.  In fact, only when a subscriber complains about a certain profile is any investigation undertaken to determine if the profile is fraudulent.

62.     Despite Match's representation that it may review and delete any content, photos, or profiles that violate its terms (Agreement ¶9(b)), thousands of profiles remain on Match that are fake or fraudulent.  In numerous instances, the same photograph or groups of photographs and the same text and descriptions are used for hundreds of different profiles with the profiles indicating that the same person (albeit different user names) resides in different parts of the United States.

63.     In numerous instances the profile photos attached to these fake and fraudulent profiles are of pornographic actresses, celebrities, and models, seemingly stolen from independent websites.

64.     In addition, profiles are listed as belonging to subscribers in the United States when they are in fact posted using IP addresses originating in Nigeria, Russia, Eastern Europe, Malaysia, Ghana, and other regions notorious for being hotbeds of internet scamming activity.

65.     Numerous computer technologies exist that would allow Match to effectively and efficiently police its website for the benefit and safety of its customers including, but not limited to, photograph and key word recognition software (to identify use of the same photographs and/or same text in multiple profiles) and IP address and email recognition software (to identify

users abroad from certain geographic regions who fraudulently post profiles domestically for illegal purposes).  However, despite their existence and availability, Match fails to utilize such technologies or take any reasonable steps to ensure the integrity of its site.

66.    Other dating websites, including Match's Japanese affiliate, take steps to validate users' identities through the use of certain proofs of identity, such as legal identification and proof of employment.  Other users can then see whether a profile is supported by any validated information.  Match, however, takes no such steps to corroborate whether new profiles provide accurate personal information about the individual who subscribed.

67.    The reason Match does not take any serious measures to rid its site of inactive, fake, or fraudulent profiles and, in fact, takes steps to ensure such profiles remain on the site, is because Match expressly and publicly relies on the artificially inflated number of profiles to demonstrate that it is a growth company, gain prospective subscribers and their payment for joining the site, and retain paying subscribers.

68.    Match also engages in fraudulent or misleading or unconscionable business practices to induce Class subscribers to renew their subscriptions.  At or about the time a paid subscriber's subscription is about to expire, Match and/or its agents sends to such subscribers an electronic communication, or "wink," that advises the subscriber that persons who are active Match subscribers are trying to contact them.  In order to respond to the purported request, the subscriber and/or former subscriber must renew his/her subscription.  Once such subscription is renewed, either the profile of the purportedly interested person disappears or is inactive.  Thus, Match acquires paid subscriptions by posting false or misleading information that is prohibited by the Agreement.

69.     Match also continues to send email notifications to former subscribers alerting them of potential "matches," in some cases more than a year after the person has deactivated their account, that similarly evaporate once the individual reactivates their account.

70.     In other cases, Match falsely labels profiles as "active within [#] days" or "active within [#] hours" when the accounts belong to cancelled and/or inactive accounts that cannot be contacted.

## Plaintiffs and Class Members

71.     By virtue of their status as paying Match subscribers, Plaintiffs and other Class members were subjected regularly to Match's unconscionable and deceptive conduct as alleged herein.

72.     Plaintiffs and Class members were deprived of the benefit of their bargains when Match: (i) failed to take reasonable steps to ensure the integrity and legitimacy of its site; (ii) failed to take reasonable steps to police and remove profiles that were fake, fraudulent, and inactive; (iii) failed to take reasonable steps to block subscribers who engaged in illegitimate and illegal activity when the same was discovered; (iv) artificially inflated its subscriber base and failed to accurately disclose the number of legitimate paying subscribers; and (v) engaged in deceptive practices like falsely labeling profiles as active and sending emails telling subscribers that someone was trying to contact them.

73.     As a result of the foregoing, Plaintiffs and Class members suffered damages including, but not limited to, the cost of their subscriptions and/or renewal of same.

## COUNT I

*Violation of § 17.50(a)(3) of the Texas Deceptive Trade Practices Act*

74.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

75.    Match's wrongful conduct described herein constitutes a violation of § 17.41 *et seq.*, of the DTPA.  Plaintiffs and Class members are consumers, as described in § 17.50 of the DTPA, who purchased or sought to purchase goods or services from Match.

76.    The DTPA allows a consumer to maintain a cause of action against a defendant for engaging in unconscionable conduct or course of unconscionable conduct.  § 17.50(a)(3). Plaintiffs and Class members are consumers within the meaning of the DTPA, and entitled to bring this action under the DTPA.

77.    Match violated § 17.50(a)(3) of the DTPA by knowingly engaging in unconscionable conduct and/or an unconscionable course of conduct with regard to how it markets and operates its online dating service.  Specifically, to the detriment of Plaintiffs and Class members, Match took advantage of their lack of knowledge, ability, experience and/or capacity to a grossly unfair degree.  Match's conduct as described herein was a direct and/or producing cause of damages to Plaintiffs and Class members.

78.    The unconscionable practices stated herein took advantage of the lack of knowledge, ability, or capacity of Plaintiffs and members of the Class to a grossly unfair degree.

79.    Said unconscionable practices resulted in a gross disparity between the value received and the consideration paid by Plaintiffs and Class members for the services Match agreed to provide under the terms of the Agreement.

80.     Plaintiffs and Class members suffered economic damages as a direct and/or producing result of Match's past and ongoing violations of the DTPA.   Plaintiffs and Class members, therefore, are entitled to (a) economic damages and treble damages for Match's knowing violations of the DTPA (§17.50(b)(1)), (b) injunctive relief (§17.50(b)(2)), (c) restoration relief (§17.50(b)(3)), and (d)  attorneys' fees, litigation expenses, and court costs (§17.50(d)).

## **COUNT II**

### ***Breach of Contract***

81.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

82.     Plaintiffs and Class members entered into the Agreement with Match when they became paying subscribers to Match's online dating website.

83.     The Agreement is a valid and enforceable contract between the Parties.

84.     By entering into the Agreement, Plaintiffs and Class members entered into contracts for the services Match advertises (*i.e.,* a legitimate resource for single adults) without knowledge or information regarding the actual state of operation of Match's site.

85.     The Agreement itself is premised on the concept of providing each paying subscriber with access to a legitimate and genuine online dating service in exchange for the payment of monthly subscription fees.

86.     Match breached (and continues to breach) the Agreement by intentionally, purposefully and/or negligently engaging in the conduct alleged herein in violation of the specific terms and the essence of the Agreement.  Match further breached the Agreement by failing to take reasonable steps to ensure the integrity and legitimacy of its services.

87.     As a direct and proximate result of Match's past and ongoing breaches of the Agreement, Plaintiffs and Class members have suffered (and will continue to suffer) damages in terms of subscription fees paid—for which they are entitled to compensation.  Plaintiffs and Class members are also entitled to recover their attorneys' fees, litigation expenses and court costs pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## COUNT III

### *Breach of the Duty and/or Implied Covenant of Good Faith and Fair Dealing*

88.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

89.     The Agreement is (and continues to be) an adhesion contract that created a special relationship between Match, on the one hand, and Plaintiffs and Class members, on the other hand, because Match was (and continues to be) the superior party in an unequal bargaining situation whereby it could take and, in fact, took advantage of Plaintiffs and Class members.

90.     By delivering and entrusting confidential and personal information to Match, Match, on the one hand, and Plaintiffs and Class members, on the other hand, were (and continue to be) in special relationships of trust and confidence under Texas law.  As such, there was (and continues to be) a duty of good faith and fair dealing owed by Match to Plaintiffs and Class members under Texas law.  Pursuant to such confidential and special relationships and corresponding duty of good faith and fair dealing, Match owed (and continues to owe) Plaintiffs and Class members (i) the commitment to deal fairly and honestly, (ii) the duty to deal with Plaintiffs and Class members in good faith, and (iii) integrity of the strictest kind.  Match was (and continues to be) obligated to exercise a high degree of care in carrying out its responsibilities to Plaintiffs and Class members under such confidential and special relationships.

91.     The special relationship existing between the parties created an implied covenant of good faith and fair dealing in the Agreement under Texas law.

92.     Under the Agreement (that, in fact, Match drafted and imposed on Plaintiffs and Class members by virtue of its superior bargaining position), as well as the above-described confidential and special relationships, it is clear that Match was required to (i) deal fairly and honestly with Plaintiffs and Class members, (ii) live up to its duty to deal with Plaintiffs and Class members in good faith, (iii) demonstrate integrity of the strictest kind, (iv) deliver the products and services to Plaintiffs and Class members as advertised and contracted for, and (v) disclose the above information to Plaintiffs and Class members that it failed to disclose.

93.     As demonstrated by the above-described and enumerated wrongful acts and practices, Match's exploitation of Plaintiffs' and Class members' confidential and personal information and their emotional vulnerability, failure to deliver the promised products and services as contracted for and the repeated, ongoing, deceptive and unconscionable manipulation of Plaintiffs' and Class members' emotions for financial gain—which were (and continue to be) the direct, proximate and/or producing cause of the damages Plaintiffs and Class members have suffered (and continue to suffer)—collectively constituted (and continue to constitute) breaches of the duty of covenant of good faith and fair dealing and/or breaches of the implied covenant of good faith and fair dealing at Texas common law—for which Plaintiffs and Class members are entitled to compensation.

## **TOLLING OF THE STATUTES OF LIMITATION**

92.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

93.   **EQUITABLE ESTOPPEL.**  Match took active steps to conceal its above-described and enumerated wrongful acts and practices.  The details of Match's efforts to conceal its unlawful conduct are in its possession, custody and control, and await further discovery.  At such time that Plaintiffs learned about Match's above-described and enumerated wrongful acts and practices, they exercised due diligence by retaining counsel and pursuing their claims.  As such, and if such be necessary, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable estoppel.

94.   **EQUITABLE TOLLING.**  Match took active steps to conceal its above-described and enumerated wrongful acts and practices.  The details of Match's efforts to conceal its unlawful conduct are in its possession, custody and control, and await further discovery.  Even by exercising reasonable diligence, Plaintiffs could not have discovered this information if for no other reason than Plaintiffs had no reason to make such inquiries.  At such time that Plaintiffs learned about Match's above-described and enumerated wrongful acts and practices, they exercised due diligence by retaining counsel and pursuing their claims.  As such, and if such be necessary, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable tolling.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Class members, respectfully request that (i) Match be cited to appear and answer this lawsuit, (ii) this action be certified as a class action, (iii) Plaintiffs be designated the Class Representatives, and (iv) Plaintiffs' Interim Lead Counsel be appointed as Class counsel.  Plaintiffs, on behalf of themselves and the Class members, further request that upon final trial or hearing, judgment be awarded against Match in favor of Plaintiffs and Class members, for:

(i)      actual damages in an amount to be determined by the trier of fact;

(ii)     treble damages;

(iii)    equitable relief as set forth above;

(iv)    injunctive relief as set forth above;

(v)     pre- and post-judgment interest at the highest applicable legal rates;

(vi)    attorneys' fees and litigation expenses incurred through the trial and any appeals;

(vii)   costs of suit; and

(viii)  such other and further relief that this Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs and members of the Class demand a trial by jury of all issues so triable.

Dated:  November 16, 2011

Respectfully submitted,

By:____*s/ Roger F. Claxton*____
Roger F. Claxton
10000 N. Central Exwy, Ste 725
Dallas, TX 75231
Tel.: (214) 969-9029
Fax: (214) 953-0583
roger@claxtonlaw.com

*Interim Liaison Counsel for Plaintiffs and the Class*

**NEWMAN FERRARA LLP**
Jeffrey M. Norton
Randolph M. McLaughlin
1250 Broadway, 27th Fl.
New York, NY 10001
Tel.: (212) 619-5400
Fax: (212) 619-3090
jnorton@nfllp.com
rmclaughlin@nfllp.com

*Interim Lead Counsel for Plaintiffs and the Class*

**HARWOOD FEFFER LLP**
Robert I. Harwood
488 Madison Ave.
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
rharwood@hfesq.com

**LEVER & STOLZENBERG, LLP**
David B. Lever
Howard B. Stolzenberg
303 Old Tarrytown Rd.
White Plains, NY 10603
Tel.: (914) 288-9191
Fax: (914) 288-9197
dlever@lsinjurylaw.com
hstolzenberg@lsinjurylaw.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher
1990 North California Blvd., Ste. 940
Walnut Creek, CA 94596
Tel.: (925) 300-4455
Fax:  (925) 407-2700
ltfisher@bursor.com
            -and-
Scott A. Bursor
Joseph I. Marchese
396 Lexington Ave., 10th Fl.
New York, NY 10017
Tel.: (646) 837-7150
Fax: (212) 989-9163
jmarchese@bursor.com

**FARUQI & FARUQI, LLP**
Antonio Vozzolo
369 Lexington Ave, 10th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983 9331
avozzolo@faruqilaw.com

**THE COFFMAN LAW FIRM**
Richard L. Coffman
505 Orleans St. Ste. 505
Beaumont, TX  77701
Tel.: (409) 833-7700
Fax:  (866) 835-8250
rc@cofflaw.com

**WELLER, GREEN, TOUPS & TERRELL, LLP**
Mitchell A. Toups
P.O. Box 350
Beaumont, TX 77704
Tel.: (409) 838-0101
Fax: (409) 832-8577
matoups@wgttlaw.com

**FEAZELL & TIGHE, LLP**
Austin Tighe
Vic Feazell
6618 Sitio Del Rio Boulevard,
Building C-101
Austin, TX  78730
Tel.: (512) 372-8100
Fax: (512) 372-8100
austin@feazell-tighe.com
vic@withvic.com

**TREUHAFT & ZAKARIN, LLP**
Norah Hart
305 Broadway, 9th Floor
New York, NY  10007
Tel. (212) 897-5865
Fax: (646) 537-2662
nhart@treulaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of November, 2011, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

James Edward Maloney
Shira R. Yoshor
Baker Botts, LLP
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002

*s/ Roger F. Claxton*
ROGER F. CLAXTON