IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **DAVID ROBINSON**, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. **3:10-CV-2651-L** |
| | § | (Consolidated with Civil Action Nos. |
| **MATCH.COM, L.L.C.**, | § | 3:11-CV-1354-L; 3:11-CV-1913-L; |
| | § | 3:11-CV-02319-L; 3:11-CV-02322-L; |
| Defendant. | § | and 3:11-CV-02323-L) |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Match.com, L.L.C's Motion to Dismiss, filed December 7, 2011; and Renewed Motion to Enforce the Order Appointing Interim Lead Counsel, filed December 6, 2011, filed by Plaintiffs. After carefully reviewing the motions, briefing, pleadings, and applicable law, the court **grants** Defendant Match.com, L.L.C's Motion to Dismiss with regard to Plaintiffs' breach of contract and breach of the duty of good faith and fair dealing claims, and **dismisses with prejudice** these claims. Further, for the reasons set forth herein, the court **moves *sua sponte* for the dismissal of Plaintiffs' claim under the Texas Deceptive Trade Practices Act.** In light of the court's ruling on Defendant Match.com, L.L.C's Motion to Dismiss, the court **denies without prejudice** the Renewed Motion to Enforce the Order Appointing Interim Lead Counsel.

## I.      Background

Plaintiffs David Robinson, Allen Stone, Nancy Malsom, Claire Kilcoyne, Michael Bourne, Mary Anne Burgan, Richard Dicosola, Mike Cipriani, Janice Bond, Rile Marberry, individually and on behalf of others similarly situated, filed this class action ("the *Robinson* action") on December 30, 2010, against Defendant Match.com, L.L.C. ("Match.com"). Subsequently, similar actions filed

by other plaintiffs (all Plaintiffs in this action are collectively referred to as "Plaintiffs") in the

Northern District of Texas and California were transferred to this court and consolidated with the

*Robinson* action on August 24, 2011.[1]  Plaintiffs filed their Consolidated Amended Class Action

Complaint ("Complaint") on November 16, 2011, asserting claims for breach of contract, violations

of the Texas Deceptive Trade Practices Act ("DTPA"), and breach of the covenant of good faith and

fair dealing.  Plaintiffs also allege that the doctrine of equitable tolling applies to this action.[2]

Plaintiffs seek to recover compensatory damages in the amount of the fees they paid for Match.com

subscriptions, treble damages under the DTPA, injunctive relief to prevent the continuation of

alleged wrongful conduct by Match.com that they contend is the basis of their claims, attorney's fees,

costs, and prejudgment and postjudgment interest.

Match.com is a provider of online dating services and operates an interactive website that

permits single adults and adults separated from their spouses, who are at least 18 years of age, to

meet each other online.  Pls.' Compl., Exh. A ¶ 2.  Access to all of the features on Match.com's

website, including the ability to communicate with others, is limited to paying subscribing members.

*Id*. ¶ 3.  Match.com participants may also become members at no cost; however, such members have

---

[1] Civil Action 3:11-CV-01354-L was filed by Guy Barlow, Jr. and Mark H. Harken, individually and on behalf of others similarly situated, on June 21, 2011. Civil Action 3:11-CV-01913-L was filed by Jesse Kaposi, individually and on behalf of others similarly situated, on August 4, 2011. Civil Action 3:11-CV-02319-L was filed by Kristy Gamayo, individually and on behalf of others similarly situated, on September 9, 2011.  Civil Action 3:11-CV-02322-L was filed by Nancy Melucci, individually and on behalf of others similarly situated, on September 12, 2011. Civil Action 3:11-CV-02323-L was filed by Gail Fitzpatrick and Wayne Walker, individually and on behalf of others similarly situated, on September 9, 2011. The latter three actions were originally brought in California and transferred to this district on August 24, 2011, from the United States District Court for the Northern District of California, after Judge Saundra Brown Armstrong granted Match.com's motion to transfer based on improper venue, concluding that the California Plaintiff's claims were subject to the Match.com forum selection clause, and enforcement of such clause would not be not unreasonable.

[2] Because Match.com has not raised any statute of limitations issues at this time, the court does not address Plaintiffs' equitable tolling argument.

the ability to participate in some, but not all, of the features and services available on Match.com's website.  *Id.*  The Complaint states that all of the named Plaintiffs are, or were at all relevant times, either paying subscribers or former paying subscribers of Match.com, who take issue for a variety of reasons with the manner in which Match.com markets its business and provides dating services under the "Match.com Terms of Use Agreement" ("Agreement").

On December 7, 2011, Match.com moved to dismiss all of Plaintiffs' claims under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  Plaintiffs also moved for an order on December 6, 2011, contending that attorney Evan Spencer had violated a prior stipulated order that appointed lead interim counsel to act on behalf of Plaintiffs. On January 12, 2012, the court requested further briefing from the parties regarding the relevance of Magistrate Judge Jeff Kaplan's order in the *Brodsky* case dismissing similar DTPA class action claims against Match.com.[3]  The parties responded with supplemental briefs on January 27, 2012. The court addresses first Match.com's Rule 12(b)(6) motion to dismiss.

## II.     Standard for Rule 12(b)(6) - Failure to State a Claim

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).  A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The

---

[3] After having reviewed the parties' supplemental briefing, the court determines that the *Brodsky* case in which the plaintiffs' DTPA claims were dismissed for failure to plead reliance is not relevant to the court's treatment of Plaintiffs' DTPA claim in this action.

**Memorandum Opinion and Order - Page 3**

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citation omitted).  The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted).  When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief.  *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff.  *Sonnier v. State Farm Mutual Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F. 3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings.  *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229 (2000).  The pleadings include the complaint and any documents attached to it.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).  Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'"  *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

**Memorandum Opinion and Order - Page 4**

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff.  *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002).  While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted).  Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted).  The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim.  *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).  Stated another way, when a court deals with a Rule 12(b)(6) motion, its task is to test the sufficiency of the allegations contained in the pleadings to determine whether they are adequate enough to state a claim upon which relief can be granted.  *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *rev'd on other grounds*, 113 F.3d 1412 (5th Cir. 1997) (en banc).  Accordingly, denial of a 12(b)(6) motion has no bearing on whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge.  *Adams*, 556 F.2d at 293.

## III.   Analysis

### A.   Breach of Contract Claim

To state a claim for breach of contract under Texas law,[4] a plaintiff must allege facts from which the court can conclude "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained

---

[4] The parties agree that Texas law applies to the Agreement and Plaintiffs' claims.

**Memorandum Opinion and Order - Page 5**

by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (internal citation and quotation marks omitted).  To prevail in a breach of contract claim, a plaintiff must allege that the defendant failed to perform an act that it expressly or impliedly promised to perform. *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769-70 (Tex. App.  Dallas 2005, pet. denied).  Texas law disfavors implied covenants and generally will not look beyond the parties' written contract to imply a covenant unless it is "necessary to effectuate the parties' intent as disclosed by the contract as a whole, but not to make the contract fair, wise, or just." *Id*. at 770.  "An implied covenant is necessary to effectuate the parties' intentions only if the obligation is 'so clearly within the contemplation of the parties that they deemed it unnecessary to express it.'" *Id.* (quoting *Nalle v. Taco Bell Corp.*, 914 S.W.2d 685, 687 (Tex. App.   Austin 1996, writ denied)).

In construing contracts, the court's primary objective is "to ascertain and give effect to the intentions of the parties as expressed in the [contract]." *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998) (quotation omitted). To ascertain the parties' true intentions, the court examines "the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless." *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999).  Whether a contract is ambiguous is a question of law for the court.  *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).  "A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation."  *Id*. When a contract is worded so that it can be given a definite legal meaning, it is unambiguous, and the court construes it as a matter of law.  *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

Here, the parties focus only on whether Match.com breached the Match.com subscriber

Agreement.  In support of their contract claim, Plaintiffs generally allege:

> 82.     Plaintiffs and Class members entered into the Agreement with Match when they became paying subscribers to Match's online dating website.

> 83.     The Agreement is a valid and enforceable contract between the Parties.

> 84.     By entering into the Agreement, Plaintiffs and Class members entered into contracts for the services Match advertises (i.e., a legitimate resource for single adults) without knowledge or information regarding the actual state of operation of Match's site.

> 85.     The Agreement itself is premised on the concept of providing each paying subscriber with access to a legitimate and genuine online dating service in exchange for the payment of monthly subscription fees.

> 86.     Match breached (and continues to breach) the Agreement by intentionally, purposefully and/or negligently engaging in the conduct alleged herein in violation of the specific terms and the essence of the Agreement. Match further breached the Agreement by failing to take reasonable steps to ensure the integrity and legitimacy of its services.

> 87.     As a direct and proximate result of Match's past and ongoing breaches of the Agreement, Plaintiffs and Class members have suffered (and will continue to suffer) damages in terms of subscription fees paid    for which they are entitled to compensation.

Pls.' Compl. 21-22, ¶¶ 82-87.  Plaintiffs contend that the following specific conduct by Match.com

constitutes a breach of the Agreement:

> 48.     Match breached (and continues to breach) the terms of the Agreement by, *inter alia*:

>> a.      failing to vet new profiles;

>> b.      failing to remove inactive profiles;

>> c.      failing to accurately disclose its active and reachable subscriber base;

>> d.      falsely labeling inactive profiles as "active";

e.      failing to police its site from the proliferation of false and fraudulent profiles;

f.      failing to take reasonable steps to remove and block scammers, even after certain profiles have been reported;

g.      failing to properly warn subscribers of the proliferation of scammers on the site and failing to provide information on how to recognize and report scamming activity;

h.      failing to monitor and block IP addresses from certain countries from where scamming activity flourishes (i.e., Nigeria, Ghana, Russia, Eastern Europe, Malaysia, and other locations);

i.      falsely representing itself as a legitimate service for single adults and accepting subscription fees from subscribers and then failing to provide the service offered.

j.      failing to require additional forms of personal identity verification as is required by Match's Japanese affiliate;

k.      failing to review and/or audit a percentage of new profiles rather than automatically accepting them without further review; and

l.      failing to employ photo or text tracking technology to identify duplicate profiles.

*Id.* ¶ 48.  In addition, Plaintiffs contend that Match.com breached the Agreement as follows:

**Breaches by Match**

49.      . . . Match not only fails to remove the profiles of cancelled subscribers and/or those whose paid subscriptions have expired but, in fact, intentionally avoids doing so unless and until such persons expressly request that their profiles be removed from the site.

50.      Match fails to remove the profiles of these inactive and former subscribers in order to advertise to the public that Match has "millions" of active subscribers. By artificially inflating its active subscriber numbers, Match engaged in a deceptive practice designed to induce consumers to either become or remain paying subscribers.

51.      Match goes so far to suggest that "1 in 5 relationships start online" and that the majority of those "start at Match.com." This text appears on Match's opening page when someone visits the website for the first time      an

outlandish and unfounded claim that essentially tells consumers that Match is responsible for more than 10% of all relationships. See copy of intro page attached at Exhibit D.

52.    . . . as many as 60% (and by some accounts *more*) of the profiles on the website belong to inactive and/or fake/fraudulent users whose profiles could be viewed by paying subscribers, appear to be active, but who could not be contacted.

53.    . . . Match routinely and intentionally represents that there are significantly more active subscribers on the website than there actually are.

54.    . . . tactics Match uses to falsely represent its site include, *inter alia*:

    a.    intentionally leaving profiles of inactive subscribers viewable and searchable on its websites far beyond their date of inactivity or cancellation;

    b.    taking virtually no steps to remove inactive users from view until a complaint is received by the former user of that account;

    c.    falsely labeling profiles as "active within [#] days" when the accounts belong to cancelled and/or inactive accounts that could not be contacted;

    d.    improperly sending emails of suggested "matches" to its subscribers and inactive subscribers, even though these "matches" belong to inactive accounts who cannot be contacted;

    e.    sending former and inactive subscribers "winks" informing them that a potential match is trying to contact them in order to get them to renew their subscriptions (only to find out after they do so that the supposed seeker does not exist);

    f.    failing to effectively vet new profiles to determine whether they are fake or fraudulent despite easily discernable "red flags" (including repeated use of imagery and language, and use of notorious IP address origins, billing addresses that do not match profile locations, and a single payment source being used to create numerous profile accounts);

    g.    failing to effectively police its site to monitor and remove fake and fraudulent subscriber profiles that remain viewable by unwitting subscriber; and

      h.     failing to warn and protect its subscribers from the pervasive scammers that populate its site.

55.     In 2006-07, subscribers previously were able to hide their profiles by setting their accounts manually to "inactive" or "hidden." However, in 2008, that policy was changed so that only Match corporate employees could block a subscriber's profile from view.

56.     The Match database was (and continues to be) littered with names and faces of numerous individuals whose profiles are "unavailable" and who cannot be reached by subscribers. A substantial percentage of profiles cannot receive emails, a fact which Match, despite having the ability to do so, does not reveal to the subscribers who've paid for the ability to send emails. A substantial percentage of the profiles are no longer paying subscribers or never were, but instead, are "filler profiles."

57.     Match does not have adequate safeguards to protect its subscribers from scammers who regularly access the site and post false profiles in order to mislead and commit frauds and other crimes against subscribers. Further, Match does not adequately police its website to ensure that subscribers are, in fact, legitimate subscribers who are "interested in meeting each other" as the Agreement provides.

58.     When new subscribers submit a profile, they are told, "We have your profile and it's now being read, like all submissions, by our Customer Care team. Once it's approved   usually within 24 hours   we'll send you an email to let you know it's live on the site."

59.     Match's representation (*i.e.*, that Match is engaging in an eyes-on approval process), is, in fact, false. Indeed, new profiles are "approved" and posted almost instantaneously, illustrating that the approval process is mere window dressing to further deceive users into a sense of security.

60.     . . . upwards of 60% of the profiles (and by some reports more) were and are either inactive former users or fake or fraudulently posted by international internet scammers seeking to engage in identity theft or lure subscribers in[to] fraudulent schemes.

61.     . . . little, if any, proactive steps were or are taken by Match to ensure that profiles posted by scammers were policed and removed. In fact, only when a subscriber complains about a certain profile is any investigation undertaken to determine if the profile is fraudulent.

**Memorandum Opinion and Order - Page 10**

62.     Despite Match's representation that it may review and delete any content, photos, or profiles that violate its terms (Agreement ¶9(b)), thousands of profiles remain on Match that are fake or fraudulent. In numerous instances, the same photograph or groups of photographs and the same text and descriptions are used for hundreds of different profiles with the profiles indicating that the same person (albeit different user names) resides in different parts of the United States.

63.     In numerous instances the profile photos attached to these fake and fraudulent profiles are of pornographic actresses, celebrities, and models, seemingly stolen from independent websites.

64.     In addition, profiles are listed as belonging to subscribers in the United States when they are in fact posted using IP addresses originating in Nigeria, Russia, Eastern Europe, Malaysia, Ghana, and other regions notorious for being hotbeds of internet scamming activity.

65.     Numerous computer technologies exist that would allow Match to effectively and efficiently police its website for the benefit and safety of its customers including, but not limited to, photograph and key word recognition software (to identify use of the same photographs and/or same text in multiple profiles) and IP address and email recognition software (to identify users abroad from certain geographic regions who fraudulently post profiles domestically for illegal purposes). However, despite their existence and availability, Match fails to utilize such technologies or take any reasonable steps to ensure the integrity of its site.

66.     Other dating websites, including Match's Japanese affiliate, take steps to validate users' identities through the use of certain proofs of identity, such as legal identification and proof of employment. Other users can then see whether a profile is supported by any validated information. Match, however, takes no such steps to corroborate whether new profiles provide accurate personal information about the individual who subscribed.

67.     The reason Match does not take any serious measures to rid its site of inactive, fake, or fraudulent profiles and, in fact, takes steps to ensure such profiles remain on the site, is because Match expressly and publicly relies on the artificially inflated number of profiles to  demonstrate that it is a growth company, gain prospective subscribers and their payment for joining the site, and retain paying subscribers.

68.     Match also engages in fraudulent or misleading or unconscionable business

practices to induce Class subscribers to renew their subscriptions. At or about the time a paid subscriber's subscription is about to expire, Match and/or its agents sends to such subscribers an electronic communication, or "wink," that advises the subscriber that persons who are active Match subscribers are trying to contact them. In order to respond to the purported request, the subscriber and/or former subscriber must renew his/her subscription. Once such subscription is renewed, either the profile of the purportedly interested person disappears or is inactive. Thus, Match acquires paid subscriptions by posting false or misleading information that is prohibited by the Agreement.

69.    Match also continues to send email notifications to former subscribers alerting them of potential "matches," in some cases more than a year after the person has deactivated their [sic] account, that similarly evaporate once the individual reactivates their [sic] account.

70.    In other cases, Match falsely labels profiles as "active within [#] days" or "active within [#] hours" when the accounts belong to cancelled and/or inactive accounts that cannot be contacted.

*Id*. ¶¶ 49-70 (emphasis in original). While Plaintiffs contend that Match.com failed to fulfill these and the other obligations, the court determines, and explains more fully herein, that there is nothing in the Agreement that expressly requires Match.com to perform these alleged obligations or to take action in this regard under the Agreement as it is written.

Plaintiffs contend that, even if the Agreement does not expressly require Match.com to undertake such actions, certain provisions in the Agreement, including paragraphs 9(a), 9(b), 9(d), 9(h), 10, and 14 "would lead a reasonable consumer to believe that the information posted on Match.com's website is accurate and legitimate, [that] Match.com does not tolerate and would actively police and remove any false or misleading information, and violators of these policies would be removed by Match and their subscription rights terminated." Pls.' Compl. 12, ¶ 47.  The court disagrees.

Paragraph 9 addresses "**Content Posted by You on Match.com**.  Pls.' Compl., Exh. A ¶ 9 (emphasis in original).  The pertinent language in paragraph 9, that is referenced by Plaintiffs, states as follows:

a.     **You are solely responsible** for the Content that you publish or display (hereinafter, "post") on the Service, or transmit to other Members. **You will not** post on the Service, or transmit to other Members, any defamatory, inaccurate, abusive, obscene, profane, offensive, sexually oriented, threatening, harassing, racially offensive, or illegal material, or any material that infringes or violates another party's rights (including, but not limited to, intellectual property rights, and rights of privacy and publicity). **You will not** provide inaccurate, misleading or false information to the Company or to any other Member. If information provided to Match.com, or another Member, subsequently becomes inaccurate, misleading or false, **you will promptly notify** Match.com of such change.

b.     You understand and agree that Match.com **may** review and delete any content, messages, double-blind emails, photos or profiles (collectively, "Content"), in each case in whole or in part, that in the **sole judgment** of Match.com violate this Agreement or which might be offensive, illegal, or that might violate the rights, harm, or threaten the safety of Members.

d.     The following is a partial list of the kind of Content that is illegal or prohibited on the Website. Match.com **reserves the right** to investigate and take appropriate legal action in its sole discretion against anyone who violates this provision, including without limitation, removing the offending communication from the Service and terminating the membership of such violators. It includes, but is not limited to, Content that:

•     is patently offensive to the online community, such as Content that promotes racism, bigotry, hatred or physical harm of any kind against any group or individual;
•     harasses or advocates harassment of another person;
•     involves the transmission of "junk mail," "chain letters," or unsolicited mass mailing or "spamming";
•     promotes information that **you** know is false, misleading or promotes illegal activities or conduct that is abusive, threatening, obscene, defamatory or libelous;
•     promotes an illegal or unauthorized copy of another person's copyrighted work, such as providing pirated computer programs or

links to them, providing information to circumvent manufacture-installed copy-protect devices, or providing pirated images, audio or video, or links to pirated images, audio or video files;

• contains restricted or password only access pages, or hidden pages or images (those not linked to or from another accessible page);

• provides material that exploits people under the age of 18 in a sexual or violent manner, or solicits personal information from anyone under the age of 18;

• provides instructional information about illegal activities such as making or buying illegal weapons, violating someone's privacy, or providing or creating computer viruses;

• solicits passwords or personal identifying information for commercial or unlawful purposes from other users; and

• engages in commercial activities and/or sales without our prior written consent such as contests, sweepstakes, barter, advertising, and pyramid schemes.

h. All information **you** include in **your** Member profile must be accurate, current and complete.

Pls.' Compl., Exh. A ¶ 9(a), (b), (d), (h) (emphasis added). Paragraph 10 concerns "**Prohibited**

**Activities**" that:

Match.com **reserves the right** to investigate and terminate your membership if you have misused the Service, or behaved in a way which could be regarded as inappropriate or whose conduct is unlawful or illegal. The following is a partial list of the type of actions that **you** may not engage in with respect to the Service:

• **You will not** impersonate any person or entity.

• **You will not** "stalk" or otherwise harass any person.

• **You will not** express or imply that any statements you make are endorsed by Match.com without our specific prior written consent.

• **You will not** use any robot, spider, site search/retrieval application, or other manual or automatic device or process to retrieve, index, "data mine", or in any way reproduce or circumvent the navigational structure or presentation of the Service or its contents.

• **You will not** post, distribute or reproduce in any way any copyrighted material, trademarks, or other proprietary information without obtaining the prior consent of the owner of such proprietary rights.

- **You will not** remove any copyright, trademark or other proprietary rights notices contained in the Service.
- You will not interfere with or disrupt the Services or the site or the servers or networks connected to the Services or the site.
- **You will not** post, email or otherwise transmit any material that contains software viruses or any other computer code, files or programs designed to interrupt, destroy or limit the functionality of any computer software or hardware or telecommunications equipment.
- **You will not** forge headers or otherwise manipulate identifiers in order to disguise the origin of any information transmitted through the Service.
- **You will not** "frame" or "mirror" any part of the Service or the Website, without Match.com's prior written authorization. You also shall not use meta tags or code or other devices containing any reference to Match.com or the Service or the site in order to direct any person to any other web site for any purpose.
- **You will not** modify, adapt, sublicense, translate, sell, reverse engineer, decipher, decompile or otherwise disassemble any portion of the Service or the Website or any software used on or for the Service or cause others to do so.

Pls.' Compl., Exh. A ¶ 10  (emphasis in original as to "**Prohibited Activities**"; emphasis added in other regards).  Finally, paragraph 14 of the Agreement states as follows:  "**Blocking of IP Addresses**. In order to protect the integrity of the Service, Match.com **reserves the right** at any time in its **sole discretion** to block Members from certain IP addresses from accessing the Website." *Id*. ¶ 14 (emphasis in original as to "**Blocking of IP Addresses**"; emphasis added in other regards).

Contrary to Plaintiffs' assertions, the portions of the Agreement that Plaintiffs rely on repeatedly refer to "You," and thus unambiguously address Plaintiffs' obligations as subscribers, not the contractual obligations of Match.com.  Moreover, the Agreement does not require Match.com to undertake the actions alleged but instead merely provides that Match.com *may* undertake such actions in its sole discretion and judgment.  This language in no way requires Match.com to police, vet, update the website content, verify the accuracy of all profiles submitted and contained on the

**Memorandum Opinion and Order - Page 15**

website, or to undertake any of the actions that Plaintiffs allege Match.com failed to do.  Language such as "you are solely responsible," cannot be read to mean that Match.com accepted responsibility for the authenticity of members' information posted on its website. Moreover, Match.com disclaims any such liability relating to the truthfulness of members' information several times throughout the Agreement.  The following are but a few examples of such disclaimers:

•   "**YOU UNDERSTAND THAT MATCH.COM DOES NOT IN ANY WAY SCREEN ITS MEMBERS**."  *Id.* ¶ 7 (emphasis in original).

•   "**Match.com does not: [] guarantee the accuracy, completeness, or usefulness of any information on the Service**."  *Id.* ¶ 8(b) (emphasis in original).

•   "Match.com is not responsible for any incorrect or inaccurate Content posted." *Id.* ¶ 18 (Disclaimers).

Accordingly, Plaintiffs' contention that language in the Agreement would lead a reasonable consumer to believe that Match.com was required to police its website and member or subscriber profiles is totally without merit, especially when read in the context of the entire contract.

Plaintiffs' contention that Match.com breached the Agreement by sending e-mails to subscribers, "falsely informing them that someone is looking for them or that they have matches with non-existent profiles" or inactive members or subscribers is similarly without merit.  Pls.' Resp. 21. There is nothing in the Agreement that obligates Match.com to conduct its services using only current or "active" profiles.  As previously noted, Match.com is not obligated to update the content on its website to ensure accuracy.  Further, paragraph 4 indicates that memberships may remain active for a period of time after a member resigns or cancels his subscription. Pls.' Compl., Exh. A ¶ 4 ("If you resign or cancel your membership . . . your subscription will remain active until the end of your then current subscription period.").  Although the Agreement indicates that subscriptions will

remain active until the end of a member's then-current subscription period, it does not state that Match.com is obligated to deactivate or remove profiles visible on its website after subscriptions are cancelled or expire.

More importantly, as previously noted, the Agreement contains extensive disclaimer language through which Match.com disavows any responsibility for incorrect or inaccurate content on its website.  The Agreement also notifies subscribers that **"the Website and the Service are provided "AS-IS**,**"** and Match.com expressly disclaims any warranty of fitness for a particular purpose or non-infringement.  **Match.com cannot guarantee and does not promise any specific results from use of the Website and/or the Service**."  *Id.* ¶ 18 (emphasis added).  Thus, Plaintiffs' contention that the Agreement obligates Match.com to ensure that member or subscriber profiles are accurate and active runs counter to the specific terms of the Agreement to which they agreed upon subscribing to the service and renewing their subscriptions.

Plaintiffs similarly distort the Agreement's terms by contending that, under the Agreement, "Match will not allow its subscribers to: (a) impersonate any person or entity; (b) stalk or otherwise harass any person; and (c) forge headers or otherwise manipulate identifiers in order to disguise the origin of any information transmitted through the service." Pls.'s Compl. ¶ 45.  The Agreement does not state that Match.com will not allow its subscribers to engage in these "[p]rohibited [a]ctivities" but instead provides that Match.com "reserves the right to investigate and terminate" memberships based on the above specified misuse. Pls.' Compl., Exh. A ¶ 9.  Again, this language describes member or subscriber responsibilities, not responsibilities or obligations of Match.com.  Further,

with the phrase "reserves the right," Match.com establishes its right to take action should it so desire, but it in no way obligates itself to do so.

Plaintiffs further contend that Match.com breached the introductory paragraph of the Agreement that states Match.com is "the service for single adults to meet each other online." Pls.' Compl., Exh A ¶ Intro; Pls.' Resp. 20.  The introductory language relied on by Plaintiffs, however, is merely a general description of the services provided by Match.com. Moreover, this same introductory paragraph states, "**If you object to anything in this Agreement or the Match.com Privacy Policy, do not use the Website or the Service**."  Pls.' Compl., Exh A ¶ Intro. (emphasis in original).  Finally, with regard to Plaintiffs' contention that "[n]umerous computer technologies exist that would allow Match to effectively and efficiently police its website for the benefit and safety of its customers," and, unlike Match.com, other dating services take steps to validate users' identities, despite Plaintiffs' expressed disappointment with the services provided or not provided by Match.com, such disappointment is not sufficient to support an actionable contract claim under the terms of the Agreement that Plaintiffs agreed to as paying subscribers of Match.com.  Pls.' Compl. 16, ¶¶ 65-66.

Taking Plaintiffs' allegations as true, nothing in the Complaint, Agreement, or attached exhibits sets forth allegations to support Plaintiffs' breach of contract claim.  The allegations of the Complaint, or provisions of the attachments, are not susceptible to the meaning or interpretation Plaintiffs seeks to ascribe to them.  Plaintiffs seek to read additional language into the Agreement to support their claim; however, at the end of the day, the allegations fall far short of meeting the requisite standard for stating a claim upon which relief can be granted, as they do not allow the court

**Memorandum Opinion and Order - Page 18**

to draw a reasonable inference that Match.com is liable to Plaintiffs for a breach of contract claim.

For the reasons set forth herein, Plaintiffs have failed to state a claim upon which relief can be granted for breach of contract.

### B.      DTPA Claim

Match.com contends that it is entitled to dismissal of Plaintiffs' DTPA claim under Rule 12(b)(6) because Plaintiffs: (1) have not pleaded unconscionable conduct of a kind that is "glaringly noticeable, flagrant, complete, and unmitigated"; and (2) failed to allege that the unconscionable conduct was the producing or but for cause of their alleged injuries.  Def.'s Mot. 15-21.  Match.com argues that Plaintiffs's DTPA claim is based on the services that Plaintiffs believe Match.com ought to provide under the Agreement. Match.com contends that the conduct complained of is not unconscionable and it had no duty to undertake the action that Plaintiffs contend Match.com ought to take in light of disclaimers in the Agreement that release it from any such responsibility. Match.com further contends that the doctrine of res judicata bars Plaintiff Jessi Kaposi's DTPA claim, and Plaintiffs' DTPA allegations do not satisfy Rule 9(b)'s pleading requirements.  For support that Plaintiffs' DTPA should be dismissed, Match.com relies on *Chastain v. Koonce*, 700 S.W.2d 579, 584 (Tex. 1985), and a number of other cases.  Plaintiffs counter that their DTPA allegations are sufficient to withstand a Rule 12(b)(6) motion, that the cases cited by Match.com are inapplicable, and that the proper pleading standard is Federal Rule of Civil Procedure 8(a), not Rule 9(b).

In support of their DTPA claim under section 17.50(a)(3), Plaintiffs allege that Match.com engaged in various forms of unconscionable conduct "with regard to how it markets and operates

**Memorandum Opinion and Order - Page 19**

its online dating service."[5] Pls.' Compl. 20, ¶ 77.   The Complaint lists the following conduct that it contends is unconscionable under section 17.50(a)(3):

a.   Representing itself as a legitimate service for single adults to meet each other online and accepting subscriptions fees from subscribers and then failing to provide the service represented and offered;

b.   Negligently and/or fraudulently representing that it had millions of active subscribers when, in fact, well over half of the profiles of the purportedly active subscribers belong to inactive accounts (*i.e.*, accounts that have been canceled or expired) that cannot be contacted, and/or are fake and fraudulent profiles posted by scammers and others;

c.   Permitting, condoning or acquiescing in the posting of fake or fraudulent profiles by international internet scammers or others; thereby creating the false impression that millions of persons were active subscribers or worse, exposing Plaintiffs and other Class C members to frauds and other schemes;

d.   Failing to accurately disclose its active and reachable subscriber base;

e.   Falsely labeling inactive profiles as "active";

f.   Failing to police its site from the proliferation of false and fraudulent profiles;

g.   Failing to take reasonable steps to remove and block scammers, even after certain profiles have been reported;

h.   Failing to disclose to subscribers that Match's online dating service contains mainly inactive profiles and/or fake profiles from internet scammers;

i.   Failing to provide adequate information and tools on how to recognize and report scamming activity;

j.   Failing to monitor and block Internet Protocol ("IP") addresses from certain countries from where scamming activity flourishes (*i.e.*, Nigeria, Ghana, Russia, Eastern Europe, Malaysia, and other locations);

k.   Intentionally leaving profiles of inactive subscribers viewable and searchable on its websites far beyond their date of inactivity or cancellation;

---

[5] The parties do not dispute that Plaintiffs qualify as consumers under the DTPA.

**Memorandum Opinion and Order - Page 20**

l.      Taking virtually no steps to remove inactive users from view until a complaint is received by the former user of that account;

m.      Falsely labeling profiles as "active within [#] days" or "active within [#] hours" when the accounts belong to cancelled and/or inactive accounts that could not be contacted;

n.      Sending emails of suggested "matches" to its subscribers and inactive subscribers, even though these "matches" belong to inactive subscribers who cannot be contacted;

o.      Sending former and inactive subscribers "winks" falsely informing them that a potential match is trying to contact them in order to bait individuals to renew their subscriptions (only to find out after they do so that the supposed seeker does not exist or cannot be contacted);

p.      Failing to effectively vet new profiles to determine whether they are fake or fraudulent despite easily discernable "red flags" (including repeated use of imagery and language, and use of notorious IP address origins);

q.      Approving and posting different profiles with the same exact photographs and groups of photographs in different cities and towns throughout the United States;

r.      Approving and posting different profiles with the same exact text in different cities and towns throughout the United States;

s.      Approving and posting profiles with individuals under the age of 18 in violation of the Agreement;

t.      Approving and posting profiles that have email addresses and full names in violation of the Agreement;

u.      Approving and posting profiles with photographs that depict individuals of incorrect gender;

v.      Approving and posting fraudulent profiles with famous and notorious actors and models;

w.      Falsely representing that Match customer care approves each profile individually when in fact profiles are automatically approved;

x.      Falsely representing that there is gender parity on Match when in fact the majority of active and legitimate subscribers are male;

y.      Failing to report or investigate scammers that repeatedly post fraudulent profiles on Match;

z.      Misleading use of the notice to subscribers that, "We're sorry the profile you were looking for could not be found. Please try another profile," when such profiles have been removed for violating the Agreement;

aa.     Failing to effectively police its site to monitor and remove fake and fraudulent subscriber profiles that remain viewable by unwitting subscribers;

bb.     Engaging in fraudulent or misleading business practices for the purpose of inducing individuals to renew their subscriptions, *i.e.*, sending to paid subscribers whose subscriptions are about to expire an electronic communication, or "wink," that falsely advises the subscriber that persons who are active Match subscribers are trying to contact them;

cc.     Continuously sending emails notifications to former subscribers falsely advising them of potential "matches," in some cases more than a year after the person has deactivated their [sic] account, that are in fact profiles of inactive or nonexistent subscribers whose profiles disappear once the individual reactivates their [sic] account;

dd.     Falsely representing on the Match website that 20,000 people join the online dating service on a daily basis, when Match knew or should have known that the such number is vastly inflated, that the vast majority of its subscribers are fake profiles; and

ee.     Falsely representing on the Match website that 7 out of 10 of Match subscribers are looking for serious long-term relationships when Match knew or should have known that the vast majority of its subscribers are inactive, fake or fraudulent profiles.

Pls.' Compl. 8-10, ¶ 31.

Section 17.45 of the Texas Business & Commerce Code states that an "unconscionable action or course of action" is "an act or practice which, to a person's detriment: (A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or (B)

results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration."[6] *Latham v. Castillo*, 972 S.W.2d 66, 67 (Tex. 1998) (quoting § 17.45(5)). "To be actionable under subsection (A), the resulting unfairness must be "glaringly noticeable, flagrant, complete and unmitigated." *Id.* (quoting *Chastain*, 700 S.W.2d at 584). "A slight disparity between the consideration paid and the value received is not unconscionable." *Id.* at 583. To be unconscionable, the disparity must be "glaring and flagrant." *Id.*

In support of their DTPA claim, Plaintiffs contend that Match.com's conduct satisfies the requirements for unconscionability under subsections (A) and (B) of section 17.45 of the statute. Specifically, Plaintiffs contend that there is "a gross disparity between the value received and the consideration paid by Plaintiffs and Class members for the services Match agreed to provide under the terms of the Agreement" and that Match.com took advantage of their "their lack of knowledge, ability, experience and/or capacity to a grossly unfair degree." Pls.' Compl. 2, ¶ 2; 20, ¶ 77-78. The parties debate at length whether the conduct alleged by Plaintiffs qualifies as unconscionable under the DTPA. Plaintiffs further contend that "[b]ecause unconscionability employs an objective standard that requires the Court to examine the totality of circumstances, dismissal on the pleadings is inappropriate." Pls.' Resp. 16. Plaintiffs also note that the cases relied on by Match.com are all based on jury verdicts.

Rather than addressing the parties' arguments as to whether the conduct alleged by Plaintiffs constitutes unconscionable conduct that is actionable under the DTPA, the court **moves *sua sponte***

---

[6] Plaintiffs state in conclusory fashion that there is a gross disparity between the value received and consideration paid for Match.com's service; however, they do not allege what they paid for the services or their subscriptions, making it impossible for the court to analyze the sufficiency of their claim in this regard under Rule 12(b)(6). Plaintiffs have therefore failed to state a DTPA claim on this ground upon which relief can be granted.

**for dismissal of Plaintiffs' DTPA claim** based on the Texas Supreme Court's holding in *Crawford v. Ace Sign, Incorporated*, 917 S.W.2d 12 (Tex. 1996).   In *Crawford*, the court reaffirmed the rule announced in *Ashford Development, Incorporated v. USLife Real Estate Services*, 661 S.W.2d 933 (Tex. 1983), that "[a]n allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA." *Crawford*, 917 S.W.2d at 12 (quoting *Ashford*, 661 S.W.2d at 935).   The plaintiff in *Crawford* contracted for services in the form of a yellow page advertisement in a telephone directory. *Crawford*, 917 S.W.2d at 12. The *Crawford* plaintiff alleged that the sales agent represented to him that the success of his businesses was heavily dependent upon yellow page advertising, and that a yellow page advertisement would increase his business by at least seventy to eighty percent in the first year. *Id.* at 12-14. The plaintiff was also told that his advertisement would appear in a particular edition of the yellow pages. *Id.*  Based on these representations, the plaintiff agreed to renew a written contract for advertising. Subsequently, the defendant failed to print the advertisement as promised.

In an attempt to avoid the effects of the court's ruling in *Ashford*, the plaintiff in *Crawford* argued that the defendant not only failed to publish the advertisement as required by the parties' contract but also made certain misrepresentations during the meeting at which the plaintiff agreed to renew his yellow pages contract. *Id.* at 12-14.   Notwithstanding the plaintiff's allegations regarding the defendant's misrepresentations, the court rejected the plaintiff's argument that because the case involved more than mere nonperformance under the contract, it was actionable under the DTPA. *Id.* at 14. The court concluded that the defendant's statements, including the alleged misrepresentations, "were nothing more than representations that the defendants would fulfill their

contractual duty to publish, and the breach of that duty sounds only in contract." *Id.* The court further noted that "[t]he statements themselves did not cause any harm. The failure to run the advertisement (the breach of the contract) actually caused the lost profits, and that injury is governed by contract law, not the DTPA." *Id.* at 14-15.

Here, Plaintiffs contracted with Match.com for dating services. Like the plaintiff in *Crawford*, Plaintiffs contend that Match.com was required to but failed to perform certain obligations under the Agreement, and that Match.com made certain misrepresentations regarding its dating services to get Plaintiffs to subscribe or renew their subscriptions. Boiled down to its essence, Plaintiffs' DTPA claim is virtually identical to their contract claim that Match.com breached the Agreement. The court further notes that other than alleging their entitlement to treble damages under the DTPA, Plaintiffs' sole basis for damages is based on the recovery of "compensatory damages in the amount of fees paid for subscriptions to the Match site." Pls.' Compl. 3, ¶ 6. Thus, while Plaintiffs pleaded a cause of action under the DTPA, in reality they seek to recover the benefit of their bargain with Match.com. *See Crawford*, 917 S.W.2d at 13-14. Accordingly, any duty that Match.com had to Plaintiffs arose solely from the Agreement. *Id.* at 14. The court therefore concludes, based on the reasoning in *Crawford,* that even if it accepts as true Plaintiffs' allegations, it appears that their Complaint sounds only in contract, and they have failed to state a claim under the DTPA. Because the court believes that dismissal of Plaintiffs' DTPA claim is mandated by *Crawford*, the court does not address the parties' arguments regarding causation, res judicata, or the applicability of Rule 9(b).

### C.      Breach of Implied Covenant of Good Faith and Fair Dealing

Match.com contends that Plaintiffs' claim for breach of the duty of good faith and fair dealing should be dismissed for failure to state a claim because the Agreement imposed no duty of good faith and fair dealing, and because Plaintiffs have failed to allege any other circumstance that would give rise to such a duty under Texas law. Plaintiffs argue that the Agreement imposed an express duty of good faith and fair dealing on Match.com or, alternatively, an implied covenant of good faith and fair dealing.

Having reviewed the Agreement, the court concludes that it contains no express covenant of good faith and fair dealing. The court therefore addresses whether Match.com had an implied duty of good faith and fair dealing. The Texas Supreme Court has declined to read an implied duty of good faith and fair dealing into every contract. *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983). Such a duty arises only as a result of a "special relationship" between parties governed or created by a contract. *Arnold* v. *National Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987); *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex. 1984). The "special relationship" cause of action for breach of the duty of good faith and fair dealing "does not extend to ordinary commercial contractual relationships." *Central Sav. & Loan Ass'n v. Stemmons N.W. Bank, N.A.*, 848 S.W.2d 232, 239 (Tex. App.    Dallas 1992, no writ). As a result, Texas courts have held that the "special relationship" necessary to create a common-law duty to act in good faith does not apply to relationships of supplier-distributor, mortgagor-mortgagee, creditor-guarantor, lender-borrower, franchisor-franchisee, issuer-beneficiary letter of credit, or employer-employee. *Cole v. Hall*, 864 S.W.2d 563, 568 (Tex. App.    Dallas 1993, writ dis'd w.o.j.); *but see Davis v. West*, 317 S.W.3d

301, 312 (Tex. App.  Houston [1st Dist.] 2009, no pet.) (noting that a bank-customer relationship does not normally give rise to a special relationship; however, when a special relationship between borrower and lender has been found, it is because the lender engaged in conduct such as exercising "excessive lender control over, or influence in, the borrower's business activities").

The implied duty of good faith and fair dealing has been applied only in limited circumstances such as long-standing relations, relationships where there is an imbalance of bargaining power, and relationships involving significant trust and confidence shared by the parties. *Caton v. Leach Corp.*, 896 F.2d 939, 948 (5th Cir. 1990) (citing *Aranda v. Insurance Co.*, 748 S.W.2d 210, 212-13 (Tex. 1988)).  Texas courts have reserved "special relationship" status to relationships such as those involving an insurer and insured, principal and agent, joint venturers, and partners. *Id.*  In *Arnold v. National County Mutual Insurance Company*, 725 S.W.2d 165 (Tex. 1987), *modified on other grounds by Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826 (Tex. 1991), the Texas Supreme Court provided the following rationale for imposing this duty in the insurance context, explaining that "the parties' unequal bargaining power and the nature of insurance contracts . . . would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims." *Id.* at 167.  Additionally, "without such a cause of action insurers can arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed." *Id.*  Because insurance companies have "exclusive control over the evaluation, processing and denial of claims," the Texas Supreme Court in *Arnold* held that a breach of the duty of good faith and fair dealing claim "is stated when it is alleged that there is no

reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay." *Id.*

Whether a duty exists between the parties is initially a question of law. *H.W. Mitchell v. Missouri Kansas Texas R.R.*, 786 S.W.2d 659, 661 (Tex. 1990). The imposition of a legal duty "depends on such factors as contemporary attitudes on social, economic, and political questions," as well as "the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and consequences of placing that burden on the employer." Of these factors, "foreseeability has traditionally been considered the most significant." *Id.*

Plaintiffs contend that a "special relationship" exists because the Agreement is an adhesion contract of unequal bargaining power. Plaintiffs compare their provider-subscriber relationship with Match.com to the special relationship between insurers and insureds, arguing that Match.com maintains exclusive control over the delivery of dating services provided and Plaintiffs, as subscribers, "are at the complete mercy of Match to provide a legitimate service, and have no control over whether Match fulfills that promise fairly and in good faith." Pls.' Resp. 23. Plaintiffs further contend that there exists a "relationship of trust and confidence" between Plaintiffs and Match.com because Plaintiffs entrusted Match.com with their confidential and personal information. Pls.' Compl. 22, ¶ 90.

The court concludes that characteristics that make the relationship between an insurer and an insured special are not present in the relationship between a provider of online dating services and subscribers. Insurance contracts are generally much more restrictive than the Agreement at issue

here.  More importantly, "[i]f an insured suffers a loss, he cannot simply contract with another insurance company to cover that loss." *City of Midland v. O'Bryant*, 18 S.W.3d 209, 215 (Tex. 2000).  By contrast, a subscriber of online dating services, who is unhappy with a particular provider of dating services, can easily seek out alternative dating services.  *Id.*  Moreover, Plaintiffs cite no authority, and the court is aware of none, that supports their position that Texas courts would find a special relationship between a  provider of online dating services and subscribers.  The court therefore declines Plaintiffs' invitation to find such a special relationship and instead concludes that the relationship between the parties is an "ordinary commercial contractual relationship." *See Central Sav. & Loan Ass'n,*, 848 S.W.2d at 240 (concluding that a special relationship is not created by one party trusting another and relying on that party's contractual promise to perform the contract).  Further, "[a]bsent an *Arnold* 'special relationship,' the duty to act in good faith is contractual in nature and its breach does not amount to an independent tort." *Cole v. Hall*, 864 S.W.2d at 568 (quoting *Central Sav. & Loan Ass'n*, 848 S.W.2d at 239).

Plaintiffs likewise cite no authority and provide no argument to support the contention asserted in their Complaint that a special relationship exists because Plaintiffs entrusted Match.com with their confidential and personal information.  In any event, it appears that Plaintiffs misconstrue what is required for a special relationship based on "significant trust and confidence shared by the parties." *Caton*, 896 F.2d at 948 (citing *Aranda*, 748 S.W.2d at 212-13).  If, as Plaintiffs contend, that all that is necessary to create a special relationship is providing another party to a contract with confidential and personal information, virtually *every* online transaction for the purchase of goods or services that requires the purchaser to provide credit card information, a home address for

shipping, and other contact information, would give rise to a special relationship. The court therefore disagrees that Plaintiffs' mere subjective trust in providing Match.com with confidential and personal information transformed the parties' relationship into a special one.

As Texas courts have not yet placed the online dating services provider-subscriber relationship into the category of relationships deserving special protection, the court determines, as a matter of law, that no duty of good faith and fair dealing exists between Plaintiffs and Match.com. Plaintiffs have therefore failed to state a claim upon which relief can be granted for breach of the duty of good faith and fair dealing.

## IV.    Amendment of Pleadings

Plaintiffs request to amend their pleadings in the event the court determines that they have failed to state a claim. The court has determined that Plaintiffs' claims based on breach of contract and breach of the covenant of good faith and fair dealing fail as a matter of law, and it determines that amendment would be futile. Accordingly, amendment will not be permitted. No amount of artful pleading or legal legerdemain will allow a claim to be stated under these two theories of recovery because no legal bases exist to support such claims based on the Complaint, Agreement, and attachments, which are all part of the pleadings and are the only documents that provide a source for Plaintiffs' purported claims of breach of contract and breach of the covenant of good faith and fair dealing. Plaintiffs request to amend these claims is therefore **denied.** After Plaintiffs have responded to the court's *sua sponte* motion for dismissal of their DTPA claim, the court will determine whether Plaintiffs should be permitted to further amend their allegations in support of this claim.

**Memorandum Opinion and Order - Page 30**

**V.      Renewed Motion to Enforce the Order Appointing Interim Lead Counsel**

Because the court has concluded that Match.com is entitled to dismissal of Plaintiffs' breach of contract and breach of the duty of good faith claims, and the court has *sua sponte* moved for dismissal of Plaintiff's DTPA claim, the court **denies without prejudice** the Renewed Motion to Enforce the Order Appointing Interim Lead Counsel.  In the event that Plaintiffs' DTPA claim survives dismissal, they may reurge their Motion to Enforce the Order Appointing Interim Lead Counsel**.**

**VI.     Conclusion**

For the reasons herein stated, the court **grants** Defendant Match.com, L.L.C's Motion to Dismiss with regard to Plaintiffs' breach of contract and breach of the duty of good faith and fair dealing claims, and **dismisses with prejudice** these claims.  Further, for the reasons set forth herein, the court **moves *sua sponte* for the dismissal of Plaintiffs' DTPA claim.**  Plaintiffs are **directed** to file a response, **not to exceed 10 pages**, to the court's *sua sponte* motion for the dismissal of Plaintiffs' DTPA claim by **August 27, 2012, 12:00 p.m.**  Match.com **shall not file a reply to Plaintiffs' response unless directed to do so by the court.**  Failure by Plaintiffs to comply with the court's order to file a response by August 27, 2012, 12:00 p.m., will result in the dismissal of their DTPA claim pursuant to Rule 41(b) of the Federal Rules of Civil Procedure for failure to comply with a court order or dismissal pursuant to Rule 12(b)(6).  In light of the court's ruling on Defendant Match.com, L.L.C's Motion to Dismiss, the court **denies without prejudice** the Renewed Motion to Enforce the Order Appointing Interim Lead Counsel.

**It is so ordered** this 10th day of August, 2012.

Sam A. Lindsay
United States District Judge