IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **DAVID ROBINSON**, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. **3:10-CV-2651-L** |
| v. | § | (Consolidated with Civil Action Nos. |
| | § | 3:11-CV-1354-L; 3:11-CV-1913-L; |
| **MATCH.COM, L.L.C.**, | § | 3:11-CV-02319-L; 3:11-CV-02322-L; |
| | § | and 3:11-CV-02323-L) |
| Defendant. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

On August 8, 2012, the court moved *sua sponte* for the dismissal of Plaintiffs' claim under the Texas Deceptive Trade Practices Act ("DTPA"). As directed by the court, the parties both submitted supplemental briefing on the issue. After carefully reviewing the parties' prior and supplemental briefing, pleadings, and applicable law, the court determines that Plaintiffs have failed to state a claim upon which relief can be granted under the DTPA and **dismisses** Plaintiffs' DTPA claim and this case **with prejudice**.

## I.     Standard for Rule 12(b)(6) - Failure to State a Claim

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229 (2000). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp*., 987 F.2d 429, 431 (7th Cir. 1993)).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan*

*Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002).  While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679 (citation omitted).  Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted).  The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim.  *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).  Stated another way, when a court deals with a Rule 12(b)(6) motion, its task is to test the sufficiency of the allegations contained in the pleadings to determine whether they are adequate enough to state a claim upon which relief can be granted.  *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *rev'd on other grounds*, 113 F.3d 1412 (5th Cir. 1997) (en banc).  Accordingly, denial of a 12(b)(6) motion has no bearing on whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge.  *Adams*, 556 F.2d at 293.

## II.    DPTA Claim

In support of its Rule 12(b)(6) motion, Match.com previously argued that it was entitled to dismissal of Plaintiffs' DTPA claim under Rule 12(b)(6) because Plaintiffs: (1) have not pleaded unconscionable conduct of a kind that is "glaringly noticeable, flagrant, complete, and unmitigated"; and (2) failed to allege that the unconscionable conduct was the producing or but for cause of their alleged injuries. Def.'s Mot. 15-21.  Match.com argued that Plaintiffs' DTPA claim is based on the services that Plaintiffs believe Match.com ought to provide under the "Match.com Terms of Use Agreement" ("Agreement").  Match.com contended that the conduct complained of is not

unconscionable and it had no duty to undertake the action that Plaintiffs contend Match.com ought

to take in light of numerous disclaimers in the Agreement that release it from any such responsibility.

Match.com further contended that the doctrine of res judicata bars Plaintiff Jessi Kaposi's DTPA

claim, and Plaintiffs' DTPA allegations do not satisfy Rule 9(b)'s pleading requirements.  For

support that Plaintiffs' DTPA should be dismissed, Match.com relied on *Chastain v. Koonce*, 700

S.W.2d 579, 584 (Tex. 1985), and a number of other cases.  Plaintiffs countered that their DTPA

allegations are sufficient to withstand a Rule 12(b)(6) motion, that the cases cited by Match.com are

inapplicable, and that the proper pleading standard is Federal Rule of Civil Procedure 8(a), not Rule

9(b).

In support of their DTPA claim under section 17.50(a)(3), Plaintiffs allege that Match.com

engaged in various forms of unconscionable conduct "with regard to how it markets and operates

its online dating service."[1]  Pls.' Compl. 20, ¶ 77.  The Complaint lists the following conduct that

it contends is unconscionable under section 17.50(a)(3):

   a.   Representing itself as a legitimate service for single adults to meet each other
        online and accepting subscriptions fees from subscribers and then failing to
        provide the service represented and offered;

   b.   Negligently and/or fraudulently representing that it had millions of active
        subscribers when, in fact, well over half of the profiles of the purportedly
        active subscribers belong to inactive accounts (*i.e.*, accounts that have been
        canceled or expired) that cannot be contacted, and/or are fake and fraudulent
        profiles posted by scammers and others;

   c.   Permitting, condoning or acquiescing in the posting of fake or fraudulent
        profiles by international internet scammers or others; thereby creating the
        false impression that millions of persons were active subscribers or worse,
        exposing Plaintiffs and other Class C members to frauds and other schemes;

---

[1] The parties do not dispute that Plaintiffs qualify as consumers under the DTPA.

d.      Failing to accurately disclose its active and reachable subscriber base;

e.      Falsely labeling inactive profiles as "active";

f.      Failing to police its site from the proliferation of false and fraudulent profiles;

g.      Failing to take reasonable steps to remove and block scammers, even after certain profiles have been reported;

h.      Failing to disclose to subscribers that Match's online dating service contains mainly inactive profiles and/or fake profiles from internet scammers;

[i.]    Failing to provide adequate information and tools on how to recognize and report scamming activity;

j.      Failing to monitor and block Internet Protocol ("IP") addresses from certain countries from where scamming activity flourishes (*i.e.*, Nigeria, Ghana, Russia, Eastern Europe, Malaysia, and other locations);

k.      Intentionally leaving profiles of inactive subscribers viewable and searchable on its websites far beyond their date of inactivity or cancellation;

l.      Taking virtually no steps to remove inactive users from view until a complaint is received by the former user of that account;

m.      Falsely labeling profiles as "active within [#] days" or "active within [#] hours" when the accounts belong to cancelled and/or inactive accounts that could not be contacted;

n.      Sending emails of suggested "matches" to its subscribers and inactive subscribers, even though these "matches" belong to inactive subscribers who cannot be contacted;

o.      Sending former and inactive subscribers "winks" falsely informing them that a potential match is trying to contact them in order to bait individuals to renew their subscriptions (only to find out after they do so that the supposed seeker does not exist or cannot be contacted);

p.      Failing to effectively vet new profiles to determine whether they are fake or fraudulent despite easily discernable "red flags" (including repeated use of imagery and language, and use of notorious IP address origins);

q.    Approving and posting different profiles with the same exact photographs and groups of photographs in different cities and towns throughout the United States;

r.    Approving and posting different profiles with the same exact text in different cities and towns throughout the United States;

s.    Approving and posting profiles with individuals under the age of 18 in violation of the Agreement;

t.    Approving and posting profiles that have email addresses and full names in violation of the Agreement;

u.    Approving and posting profiles with photographs that depict individuals of incorrect gender;

v.    Approving and posting fraudulent profiles with famous and notorious actors and models;

w.    Falsely representing that Match customer care approves each profile individually when in fact profiles are automatically approved;

x.    Falsely representing that there is gender parity on Match when in fact the majority of active and legitimate subscribers are male;

y.    Failing to report or investigate scammers that repeatedly post fraudulent profiles on Match;

z.    Misleading use of the notice to subscribers that, "We're sorry the profile you were looking for could not be found. Please try another profile," when such profiles have been removed for violating the Agreement;

aa.   Failing to effectively police its site to monitor and remove fake and fraudulent subscriber profiles that remain viewable by unwitting subscribers;

bb.   Engaging in fraudulent or misleading business practices for the purpose of inducing individuals to renew their subscriptions, *i.e.*, sending to paid subscribers whose subscriptions are about to expire an electronic communication, or "wink," that falsely advises the subscriber that persons who are active Match subscribers are trying to contact them;

cc.   Continuously sending emails notifications to former subscribers falsely advising them of potential "matches," in some cases more than a year after the person has deactivated their [sic] account, that are in fact profiles of

inactive or nonexistent subscribers whose profiles disappear once the individual reactivates their [sic] account;

dd.     Falsely representing on the Match website that 20,000 people join the online dating service on a daily basis, when Match knew or should have known that the such number is vastly inflated, that the vast majority of its subscribers are fake profiles; and

ee.     Falsely representing on the Match website that 7 out of 10 of Match subscribers are looking for serious long-term relationships when Match knew or should have known that the vast majority of its subscribers are inactive, fake or fraudulent profiles.

Pls.' Compl. 8-10, ¶ 31.

Section 17.45 of the Texas Business & Commerce Code states that an "unconscionable action or course of action" is "an act or practice [that], to a person's detriment: (A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or (B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration."[2] *Latham v. Castillo*, 972 S.W.2d 66, 67 (Tex. 1998) (quoting § 17.45(5)). "To be actionable under subsection (A), the resulting unfairness must be "glaringly noticeable, flagrant, complete and unmitigated." *Id.* (quoting *Chastain*, 700 S.W.2d at 584). "A slight disparity between the consideration paid and the value received is not unconscionable." *Id.* at 583. To be unconscionable, the disparity must be "glaring and flagrant." *Id.*

In response to Match.com's motion to dismiss their DTPA claim under section 17.50(a)(3), Plaintiffs previously argued that Match.com's conduct satisfies the requirements for unconscionability under subsections (A) and (B) of section 17.45 of the statute. Specifically,

---

[2] Plaintiffs state in conclusory fashion that there is a gross disparity between the value received and consideration paid for Match.com's service; however, they do not allege what they paid for the services or their subscriptions, making it impossible for the court to analyze the sufficiency of their claim in this regard under Rule 12(b)(6). Plaintiffs have therefore failed to state a DTPA claim on this ground upon which relief can be granted.

**Memorandum Opinion and Order - Page 7**

Plaintiffs contended that there is "a gross disparity between the value received and the consideration paid by Plaintiffs and Class members for the services Match agreed to provide under the terms of the Agreement" and that Match.com took advantage of their "their lack of knowledge, ability, experience and/or capacity to a grossly unfair degree." Pls.' Compl. 2, ¶ 2; 20, ¶ 77-78. The parties debated at length whether the conduct alleged by Plaintiffs qualifies as unconscionable under the DTPA. Plaintiffs further contended that "[b]ecause unconscionability employs an objective standard that requires the Court to examine the totality of circumstances, dismissal on the pleadings is inappropriate." Pls.' Resp. 16. Plaintiffs also noted that the cases relied on by Match.com were all based on jury verdicts.

Rather than addressing the parties' arguments as to whether the conduct alleged by Plaintiffs constitutes unconscionable conduct that is actionable under the DTPA, the court moved *sua sponte* for dismissal of Plaintiffs' DTPA claim based on the Texas Supreme Court's holding in *Crawford v. Ace Sign, Incorporated*, 917 S.W.2d 12 (Tex. 1996). In *Crawford*, the court reaffirmed the rule announced in *Ashford Development, Incorporated v. USLife Real Estate Services*, 661 S.W.2d 933 (Tex. 1983), that "[a]n allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA." *Crawford*, 917 S.W.2d at 12 (quoting *Ashford*, 661 S.W.2d at 935). The plaintiff in *Crawford* contracted for services in the form of a yellow page advertisement in a telephone directory. *Crawford*, 917 S.W.2d at 12. The *Crawford* plaintiff alleged that the sales agent represented to him that the success of his businesses was heavily dependent upon yellow page advertising, and that a yellow page advertisement would increase his business by at least seventy to eighty percent in the first year. *Id.* at 12-14. The plaintiff was also told that his advertisement would appear in a particular edition of the yellow pages. *Id.* Based on these

representations, the plaintiff agreed to renew a written contract for advertising. Subsequently, the defendant failed to print the advertisement as promised.

In an attempt to avoid the effects of the court's ruling in *Ashford*, the plaintiff in *Crawford* argued that the defendant not only failed to publish the advertisement as required by the parties' contract but also made certain misrepresentations during the meeting at which the plaintiff agreed to renew his yellow pages contract. *Id.* at 12-14. Notwithstanding the plaintiff's allegations regarding the defendant's misrepresentations, the court rejected the plaintiff's argument that because the case involved more than mere nonperformance under the contract, it was actionable under the DTPA. *Id.* at 14. The court concluded that the defendant's statements, including the alleged misrepresentations, "were nothing more than representations that the defendants would fulfill their contractual duty to publish, and the breach of that duty sounds only in contract." *Id.* The court further noted that "[t]he statements themselves did not cause any harm. The failure to run the advertisement (the breach of the contract) actually caused the lost profits, and that injury is governed by contract law, not the DTPA." *Id.* at 14-15.

As noted in the court's August 10, 2012 opinion, Plaintiffs contracted with Match.com for dating services. Like the plaintiff in *Crawford*, Plaintiffs contend that Match.com was required to but failed to perform certain obligations under the Agreement, and that Match.com made certain misrepresentations regarding its dating services to get Plaintiffs to subscribe or renew their subscriptions. Plaintiffs' DTPA claim is virtually identical to their contract claim that Match.com breached the Agreement. The court further notes that other than alleging their entitlement to treble damages under the DTPA, Plaintiffs' sole basis for damages is based on the recovery of "compensatory damages in the amount of fees paid for subscriptions to the Match site." Pls.' Compl.

3, ¶ 6.  Thus, while Plaintiffs pleaded a cause of action under the DTPA, in reality they seek to recover the benefit of their *perceived* bargain with Match.com.  *See Crawford*, 917 S.W.2d at 13-14. Accordingly, any duty that Match.com had to Plaintiffs arose solely from the Agreement.  *Id*. at 14. The court therefore concludes, based on the reasoning in *Crawford,* that even if it accepts as true Plaintiffs' allegations, it appears that their Complaint sounds only in contract, and they have failed to state a claim under the DTPA.  Because the court believed that dismissal of Plaintiffs' DTPA claim was mandated by *Crawford*, the court did not address the parties' arguments regarding causation, res judicata, or the applicability of Rule 9(b).

In response to the court's *sua sponte* motion, Plaintiffs contend that *Crawford* does not warrant dismissal of their DTPA claim because:

> Match.com does not simply mislead people into signing up for its service with inflated assurances of finding love, rather, the company engages in wholesale and unremitting deception that prays on the vulnerabilities and emotions of unwitting consumers. To be clear, Plaintiffs are not alleging that mere puffery resulted in them not obtaining the benefit of their bargain but that they were subjected to a host of unconscionable practices, giving their money, personal information, and time to a company that was actively engaged in taking advantage of them to a grossly unfair degree.

> As the Court recognized, the conduct alleged by Plaintiffs went beyond the obligations and representations contained in the Terms of Use Agreement (the "Agreement"). Indeed, that was the Court's rationale for dismissing Plaintiffs' breach of contract claims. Stated otherwise, because Match.com never agreed to provide a legitimate service or to protect its subscribers from its own unconscionable conduct, it did not breach the terms of the Agreement. Even assuming that is correct, Match.com does not get a free pass when its conduct nonetheless violates legal duties imposed by the DTPA. This is what separates the instant matter from *Crawford*.

Pls.' Resp. 1.  Plaintiffs contend that like the fraudulent misrepresentation claims at issue in *Formosa Plastics Corporation USA v. Presidio Engineers and Contractors, Incorporated*, 960 S.W.2d 41, 47 (Tex. 1998), "the DTPA implicates a heightened duty, the obligation not to act

unconscionably in the delivery of goods and services." Pls.' Resp. 8.  Plaintiffs therefore argue that when a defendant's conduct violates the DTPA, a DTPA claim can survive even if the loss sustained is based solely on the defendant's breach of the parties' contract.  For support, Plaintiffs rely on *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304-05 (Tex. 2006); *Howell Crude Oil Company v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 109 (Tex. App.   Houston [14th Dist.] 1996, writ denied); *Balay v. Gamble*, No. 01-10-00017-CV, 2011 WL 2435929 (Tex. App.   Houston [1st Dist.] June 16, 2011, no pet.); and *A.I.G. Construction Company, Incorporated v. Thomson*, No. 14-03-00021-CV, 2004 WL 2002556 (Tex. App.   Houston [14th Dist.] Sept. 9, 2004, pet. denied). Plaintiffs further contend that *Crawford* is distinguishable because the loss in that case was not caused by the defendant's representation but instead by its failure to print the ad as required under the parties' contract.  Finally, Plaintiffs maintain that the issue of whether Match.com's alleged conduct was the producing cause of Plaintiffs' economic loss is a fact-driven inquiry that is inappropriate for determination at the pleading stage.

Match.com counters that *Crawford* is directly applicable to this case because Plaintiffs' DTPA and breach of contract claims are identical.  For support, Match.com attaches to its reply brief a chart comparing Plaintiffs' DTPA and contract allegations.  In addition, Match.com contends that none of the cases cited by Plaintiffs is applicable because each dealt with allegations involving fraudulent inducement, misrepresentation, and similar DTPA laundry list claims, whereas Plaintiffs have previously asserted that they were not pursuing such a claim under the DTPA and, in fact, used this as a basis to argue that they are not required to allege or show reliance.  Defendants further note that the reasoning in the *Brodsky* litigation forecloses any such claim and a reliance requirement would bar class consideration.

**Memorandum Opinion and Order - Page 11**

Match.com also argues, as it did in its original motion, that dismissal is appropriate because Plaintiffs have failed to plead that the alleged unconscionable conduct was a "producing" cause of their injury. Irrespective of *Crawford*, Match.com contends that Plaintiffs' DTPA claim fails because, as it stated in its motion to dismiss, "Plaintiffs' mere pleading that Match engaged in allegedly questionable business practices or that Match.com took advantage of its users, is simply insufficient to plead the 'glaringly noticeable, flagrant, complete and unmitigated' conduct sufficient to establish § 17.50(a)(3) liability." Def.'s Reply 6.

The court concludes that the reasoning in *Crawford* applies to Plaintiffs' DTPA claim for the reasons previously stated. Moreover, after considering all arguments by the parties, including those previously raised in conjunction with Match.com's Rule 12(b)(6) motion to dismiss, the court determines that Plaintiffs' DTPA claim fails as a matter of law for two additional reasons that have been briefed previously by the parties.

## A.      Plaintiffs' Laundry List DTPA Claims

The first ground for dismissal requires the court to revisit its earlier determination regarding the applicability of the reasoning in *Brodsky* to Plaintiffs' DTPA claim in this case. *Brodsky v. Match.com, LLP*, No. 3-09-CV-2066-F-BD, 2010 WL 3895513 (N.D. Tex. Sep. 30, 2010). In its August 10, 2012 opinion, the court noted as follows in footnote 3: "After having reviewed the parties' supplemental briefing, the court determines that the *Brodsky* case in which the plaintiffs' DTPA claims were dismissed for failure to plead reliance is not relevant to the court's treatment of Plaintiffs' DTPA claim in this action." *Robinson v. Match.com, L.L.C.*, Nos. 3:10-CV-2651-L, 3:11-CV-02319-L, 3:11-CV-02322-L, 3:11-CV-02323-L, 3:11-CV-1354-L, 3:11-CV-1913-L, 2012 WL 3263992, at *1 n.3 (N.D. Tex. Aug. 10, 2012). On January 12, 2012, long before the court

entered its August 10, 2012 order as to Match.com's motion to dismiss, the court entered a one-page

order, requesting additional briefing on the issue of whether Plaintiffs' DTPA claim was susceptible

to dismissal for the same reason that the Plaintiffs' DTPA claim in *Brodsky v. Match.com, LLP* was

dismissed, that is, for failure to allege facts, that if proved, would establish the requisite element of

reliance:

> On December 7, 2011, Defendant Match.com, L.L.C. filed a Motion to Dismiss. Among other things, Defendant contends in its motion that dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate for the same reasons identified in Magistrate Judge Jeff Kaplan's order dismissing similar claims in *Brodsky v. Match.com, LLP*, No. 3-09-CV-2066-F-BD, 2010 WL 3895513 (N.D. Tex. Sep. 30, 2010).  In a September 30, 2010 order, Judge Kaplan concluded that the plaintiffs' failure to plead facts that establish reliance was fatal to their claims for fraud, fraudulent inducement, negligent misrepresentation, and violations of the DTPA.  *Id.* at *2-3.

> In reviewing the parties' submissions in this case, it does not appear they have addressed this issue with regard to Plaintiffs' DTPA claim. The court therefore requests that the parties submit additional briefing on this issue by January 27, 2012.

Doc. 61.  Plaintiffs took the position in their supplemental brief that reliance is not an element of

their DTPA claim and the reasoning in *Brodsky* does not apply because, unlike *Brodsky*, which

involved a section 17.50(a)(1) DTPA claim, Plaintiffs' "unconscionability" DTPA claim is brought

pursuant to section 17.50(a)(3), which does not require a showing of reliance:

> In *Brodsky v. Match.com, LLP*, No. 3-09-CV-2066-F-BD ("Brodsky"), Magistrate Judge Jeff Kaplan determined that the plaintiffs' failure to plead reliance was fatal to their claims for fraud, fraudulent inducement, negligent representation, and violations of DTPA §§17.50(a)(1) and 17.46(b). While Judge Kaplan may have been correct, none of those claims are alleged in this action. On the contrary, Plaintiffs here assert a claim under DTPA §17.50(a)(3) which was not alleged in Brodsky and which does not require pleading facts to establish reliance.

Pls.' Supp. Brief 1 (Doc. 62).   Nine months later, Plaintiffs continue to maintain that their DTPA claim is based on alleged unconscionable practices under section 17.50(a)(3); however, as correctly noted by Match.com, all of the DTPA cases cited by Plaintiffs involve fraudulent inducement and misrepresentation claims that require a showing of reliance.   Plaintiffs cannot have it both ways.

The elements of a DTPA claim are: (1) the plaintiff is a consumer; (2) the defendant either engaged in false, misleading or deceptive acts, that is, violated a specific laundry-list provision of section 17.46 of the DTPA, or engaged in an unconscionable action or course of action; and (3) the DTPA laundry-list violation or unconscionable action was a producing cause of the plaintiff's injury. Tex. Bus. & Com. Code Ann. § 17.50(a)(1) (West 2011); *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex.1995). Reliance by the consumer is an element of DTPA claims that are based on false, misleading, or deceptive practices or section 17.46's laundry list violations. § 17.50(a)(1)(A)-(B).   Section 17.46 includes a list of practices that constitutes false, misleading, or deceptive acts or practices for purposes of section 17.50(a)(1) of the DTPA.   *Id.*; *see also* § 17.46(b)(1)-(27).   The following practices under section 17.46 are relevant to Plaintiffs' DTPA claim:

> (4) using deceptive representations . . . in connection with goods or services;
>
> (5) representing that goods or services have . . . characteristics, . . . benefits . . . which they do not have . . . . ;
>
> (9) advertising goods or services with intent not to sell them as advertised;
>
> (12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;
>
> (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended

**Memorandum Opinion and Order - Page 14**

to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

§ 17.46(b)(4), (5), (9), (12), (24).

A careful review of Plaintiffs' Complaint reveals that all of their DTPA allegations can be traced to one of the above referenced deceptive practices. Specifically, all of Plaintiffs' allegations derive from their contention that (1) Match.com made various false representations for the purpose of misleading consumers about the dating services offered by Match.com, and in particular the number of active Match.com members; and (2) Match.com failed to take "measures to rid its site of inactive, fake, or fraudulent profiles and, in fact, takes steps to ensure such profiles remain on the site . . . [to] artificially inflate[]" the number of active members. According to Plaintiffs, Match.com engaged in the aforementioned deceptive practices "to induce consumers to either become or remain paying subscribers." *See, e.g.*, Pls.' Compl. 9-10, 14-18, ¶¶ 31(a)-(ee), 49-68. At a minimum, Plaintiffs' DTPA claim, based on the following allegations, falls under section 17.46:

a. *Representing itself as a legitimate service* for single adults to meet each other online and accepting subscriptions fees from subscribers and *then failing to provide the service represented and offered*;

b. Negligently and/or *fraudulently representing* that it had millions of active subscribers when, in fact, well over half of the profiles of the purportedly active subscribers belong to inactive accounts (*i.e.*, accounts that have been canceled or expired) that cannot be contacted, and/or are fake and fraudulent profiles posted by scammers and others;

c. Permitting, condoning or acquiescing in the posting of fake or fraudulent profiles by international internet scammers or others; *thereby creating the false impression* that millions of persons were active subscribers or worse, exposing Plaintiffs and other Class C members to frauds and other schemes;

d. *Failing to accurately disclose* its active and reachable subscriber base;

e.      *Falsely labeling* inactive profiles as "active";

h.      *Failing to disclose* to subscribers that Match's online dating service contains mainly inactive profiles and/or fake profiles from internet scammers;

[i.]    *Failing to provide [disclose] adequate information* and tools on how to recognize and report scamming activity;

k.      *Intentionally leaving profiles of inactive subscribers viewable and searchable* on its websites far beyond their date of inactivity or cancellation;

l.      *Taking virtually no steps to remove inactive users from* view until a complaint is received by the former user of that account;

m.      *Falsely labeling profiles* as "active within [#] days" or "active within [#] hours" when the accounts belong to cancelled and/or inactive accounts that could not be contacted;

n.      *Sending emails of suggested "matches" to its subscribers* and inactive subscribers, *even though these "matches" belong to inactive subscribers who cannot be contacted*;

o.      *Sending former and inactive subscribers "winks" falsely informing them* that a potential match is trying to contact them in order to bait individuals to renew their subscriptions (only to find out after they do so that the supposed seeker does not exist or cannot be contacted);

w.      *Falsely representing* that Match customer care approves each profile individually when in fact profiles are automatically approved;

x.      *Falsely representing* that there is gender parity on Match when in fact the majority of active and legitimate subscribers are male;

y.      *Failing to report [disclose]* or investigate scammers that repeatedly post fraudulent profiles on Match;

z.      *Misleading use of the notice to subscribers* that, "We're sorry the profile you were looking for could not be found. Please try another profile," when such profiles have been removed for violating the Agreement;

bb.     *Engaging in fraudulent or misleading business practices for the purpose of inducing individuals to renew their subscriptions*, *i.e.*, sending to paid

subscribers whose subscriptions are about to expire an electronic communication, or "wink," that falsely advises the subscriber that persons who are active Match subscribers are trying to contact them;

cc.     *Continuously sending emails notifications to former subscribers falsely advising them of potential "matches,"* in some cases more than a year after the person has deactivated their [sic] account, *that are in fact profiles of inactive or nonexistent subscribers* whose profiles disappear once the individual reactivates their [sic] account;

dd.     *Falsely representing* on the Match website that 20,000 people join the online dating service on a daily basis, when Match knew or should have known that the such number is vastly inflated, that the vast majority of its subscribers are fake profiles; and

ee.     *Falsely representing* on the Match website that 7 out of 10 of Match subscribers are looking for serious long-term relationships when Match knew or should have known that the vast majority of its subscribers are inactive, fake or fraudulent profiles.

Pls.' Compl. 8-10, ¶ 31 (emphasis added).  Consequently, Plaintiffs are required but have failed to allege that they relied on Match.com's representations, nondisclosures, and conduct that is claimed to be misleading.  Accordingly, Plaintiffs have failed to state a DTPA claim upon which relief can be granted and Match.com is entitled to dismissal of Plaintiffs' DTPA claim in its entirety, or, at a minimum, it is entitled to dismissal of Plaintiffs' DTPA based on the foregoing allegations that fall under sections 17.46 and 17.50(a)(1) of the DTPA.

### B.     Plaintiffs' DTPA Claims Based on Alleged Unconscionable Conduct

Plaintiffs' DTPA claim fails for another reason.  Even when taken as true, Plaintiffs' remaining allegations, regarding Match.com's alleged unconscionable failure to ensure the accuracy of information on its website, do not give rise to a cause of action under the DTPA because of the disclaimer language and contract terms agreed to by Plaintiffs.  Boiled down to its essence,

Plaintiffs' DTPA claim is based on its contention that Match.com failed to monitor and remove from its website fraudulent and inactive user profiles to induce Plaintiffs to become or renew their memberships.

As noted by Match.com and the court's August 20, 2012 opinion, however, the Agreement at issue contains numerous disclaimers. The following are but a few examples of such disclaimers:

- "**YOU UNDERSTAND THAT MATCH.COM DOES NOT IN ANY WAY SCREEN ITS MEMBERS**." Pls.' Compl., Exh. A, ¶ 7 (emphasis in original).

- "**Match.com does not: [] guarantee the accuracy, completeness, or usefulness of any information on the Service**." *Id*. ¶ 8(b) (emphasis in original).

- "Match.com is not responsible for any incorrect or inaccurate Content posted." *Id.* ¶ 18 (Disclaimers).

The Agreement also expressly provides that users of the dating service are solely responsible for the accuracy of the information they provide to Match.com for publication on the company's website. Additionally, the Agreement makes clear that access to certain features and services on Match.com's website is not limited to subscribing members but instead is available at no cost to nonsubscribing members. *See id*. ¶ 3. As noted in the court's prior opinion, the Agreement also provides that Match.com *may* undertake a number of actions in its sole discretion and judgment but has no duty to take such actions. The Agreement further notifies subscribers that **"the Website and the Service are provided "AS-IS,"** and Match.com expressly disclaims any warranty of fitness for a particular purpose or non-infringement. **Match.com cannot guarantee and does not promise any specific results from use of the Website and/or the Service**." *Id.* ¶ 18 (emphasis added). Moreover, the Agreement states, "**If you object to anything in this Agreement or the Match.com Privacy Policy, do not use the Website or the Service**." Pls.' Compl., Exh A ¶ Intro. (emphasis in

**Memorandum Opinion and Order - Page 18**

original).  Thus, by virtue of the parties' Agreement, Plaintiffs acknowledged and agreed that Match.com had no duty to take the action they now contend it failed to take in violation of the DTPA.  As a result, Plaintiffs cannot complain that Match.com's conduct or its alleged failure to act in the manner alleged is unconscionable.

Because the Agreement here is determinative of whether Match.com's alleged conduct is unconscionable, this case is similar to *Bennett v. Bank United,* 114 S.W.3d 75, 82-83 (Tex. App.  Austin 2003, no pet.).  In *Bennett,* the plaintiff sued the bank that serviced her home mortgage loan under the DTPA after it refused to discontinue charging for private mortgage insurance ("PMI") despite a loan-to-value ratio of below 80 percent.  *Id.*  The plaintiff argued that the bank's refusal to discontinue the PMI requirement was unconscionable under the DTPA. *Id.*  The bank maintained that its conduct was not unconscionable because it was had no obligation under the deed of trust to cancel the PMI.  *Id.*  The court agreed that under the deed of trust, the plaintiff agreed to make PMI payments until the note was fully paid although not required by law to do so.  *Id.*  The court therefore concluded that the bank did not have any obligation to terminate the PMI and the plaintiff was not damaged because she had expressly agreed under the deed of trust to pay the premiums until the note was paid in full.  *Id.*  The court further noted that the parties were free to contract in this regard.  Consequently, the court concluded that the bank did not act unconscionably by acting in accordance with the parties' agreement.  *Id.*

The same is true here.  The parties were free to contract for the dating services provided by Match.com.  Plaintiffs were under no obligation to enter into the Agreement with Match.com and were free to seek dating services elsewhere if they disagreed with the terms of the Agreement.  The

Agreement located on Match.com's website states, [b]y using the Match.com website . . . you agree to be bound by these Terms of Use (this "Agreement"), whether or not you register as a member of Match.com."  Pls.' Compl., Exh. A ¶ Intro.  Thus, in using Match.com's website, Plaintiffs agreed to be bound by the Terms of Use or Agreement, which includes the numerous disclaimers discussed in this and the court's prior opinions.  As a result, Match.com was under no obligation to police its website and member's profiles as alleged by Plaintiffs, and its failure to act in this regard cannot be considered unconscionable.

Further, Plaintiffs assert that "*well over half* of the profiles on [Match.com's] website belong to inactive subscribers," which Plaintiffs define as "those who have cancelled their subscription or allowed their subscription to lapse."  Pls.' Compl. 2, ¶ 3 (emphasis in original).  Plaintiffs allege that Match.com takes no steps to remove inactive profiles from its website until a complaint is received from a former user and Match.com intentionally leaves profiles of inactive subscribers on its website long after the subscriptions are cancelled.  *Id.* 8, ¶¶ 31(k)-(l).  The Agreement, however, makes clear that Match.com's services are not limited to members who are paying subscribers.  Pls.' Compl., Exh. A ¶ 3 ("You may become a Member of the Service at no cost.  As a Member, you will have the ability to participate in some, but not all, of the features and services available within the Service.  In order to access additional features and services, including the ability to communicate with other Members, you must become a paying subcriber to the Service.").

Moreover, the Agreement does not obligate Match.com to remove the profiles of subscribing members from its website after they are terminated but instead advises that when a paying member terminates his subscription, the subscription will remain active for a period of time until the end of

the then current subscription period that was paid prior to the termination.  *Id.* ¶ 4.  Nonpaying or

nonsubscribing members cannot technically terminate a subscription that does not exist.  Thus, it is

unclear how Match.com could conceivably remove the profiles of these persons before a complaint

or other notification is received.  More importantly, as previously noted, Match.com disavows any

responsibility for the accuracy of profiles or information on its website.  Thus, Match.com's alleged

failure to timely remove inactive profiles from its website is not unconscionable according to the

terms agreed to by Plaintiffs.  There is simply no way that Plaintiffs can plead their way around this

deficiency in their pleadings.  Accordingly, there is no deceptive practice as a matter of law and

Plaintiffs' DTPA claim based on Match.com's allegedly unconscionable conduct fails and will be

dismissed.

### III.    Amendment of Pleadings

As of December 10, 2010, the *Robinson* action, which is the earliest filed case of those

consolidated in this action, will have been pending two years.  On June 3, 2011, before Match.com

filed its motion to dismiss on July 19, 2011, an "Amended Class Action Complaint" was filed in the

*Robinson* action by Plaintiffs David Robinson, Nancy Malsom, Allen Stone, Claire Kilcoyne,

Michael Bourne, Mary Anne Burgan, Richard Dicosola, Mike Cipriani, Janice Bond, and Rile

Marberry (collectively, "*Robinson* Plaintiffs").  On August 1, 2011, after Match.com filed its motion

to dismiss, but before the six cases that currently make up this action were consolidated, Plaintiffs

Mark H. Harken and Guy Barlow, Jr. in Case No. 3:11-CV-1354-L filed "Plaintiffs' First Amended

Class Action Complaint."  After the cases were consolidated, Plaintiffs filed their "Consolidated

Amended Class Action Complaint" ("Consolidated Complaint") on November 16, 2011, and Match.com moved to dismiss Plaintiffs' Consolidated Complaint on December 7, 2011.

In response to the court's January 12, 2012 order requesting additional briefing on the issue of whether Plaintiffs' DTPA claim was susceptible to dismissal based on the same reasoning in *Brodsky v. Match.com, LLP*, that is, for failure to allege facts, that if proved, would establish the requisite element of reliance, Plaintiffs steadfastly maintained that they were not required to allege reliance and did not request to amend their pleadings.  Likewise, Plaintiffs take the position in their most recent briefing that their claims are based on unconscionability under section 17.50(a)(3) even though they rely on cases involving deceptive practices, fraudulent inducement, misrepresentations and DTPA laundry list violations that include reliance as an element.  Again, however, Plaintiffs did not request to amend their pleadings despite being put on notice of this potential deficiency by the court.

In light of Plaintiffs' steadfast position on the sufficiency of their allegations, and because they have not requested to amend, the court believes that Plaintiffs have stated their "best case" and that they cannot improve upon or supplement the allegations as pleaded. The court therefore concludes that Plaintiffs cannot set forth additional allegations that exist to state a claim upon which relief can be granted and that further attempts to amend would be futile.  As a further ground disallowing amendment of the pleadings, the court determines that such further attempts would unnecessarily delay the resolution of this action.  Accordingly, the court will not allow Plaintiffs to amend their pleadings.

**IV.     Conclusion**

For the reasons herein stated, the court determines that Plaintiffs have failed to state a claim upon which relief can be granted under the DTPA and **dismisses** Plaintiffs' DTPA claim and this case **with prejudice**.   In accordance with Rule 58 of the Federal Rules of Civil Procedure, a judgment will issue by separate document.

**It is so ordered** this 17th day of October, 2012.

Sam A. Lindsay
United States District Judge